# New Street Bridge Co., Appellant, *v.* Public Service Commission et al.

*Public service companies—Bridge companies—Lease—Rates— Valuation—Lease of bridge space to street railway company—Public Service Commission—Corporations—Valuation—Fixing of rates —Police powers—Jurisdiction—Act of July 26, 1913, P. L. 1374.*

1. The properties defined in article I of the Public Service Company Act of July 26, 1913, P. L. 1374, can only be considered in connection with the companies there named when they are "doing business" contemplated by the act.

2. The act recognizes three classes of public service companies: (a) those which, in and of themselves, perform their charter obligations; (b) those that have leased their franchises and property in whole or in part, but retain their corporate identity,—lessor companies; and (c) those acquiring, by such leases, corporate franchises and properties,—lessee or operating companies.

3. The duties and liabilities, powers and limitation of powers of a lessor company·are not as extensive as those of a company that, of itself, performs its charter obligations, or of a lessee company which performs the lessor's charter obligations.

4. The terms "common carrier," "conveyance of passengers or property," "service," "facility," and the like, as used in article I of the act, cannot be applied to a lessor company. It has no such active duties to perform, nor any duty that relates to the public or in which the public has a direct interest.

5. The lessee or operating company has duties and liabilities, powers and limitations thereof, the observance of which brings these terms into appropriate consideration.

6. Such duties and powers, once attributes or obligations of the lessor, were taken from it through its lease and lodged in the lessee; the latter, however, by incorporation, possesses many rights incident to a lessor company.

7. Intermeddling by the public with the affairs of public service companies is chiefly on a question of rates, but no authority is given to so intermeddle against companies which do not deal in rates, fares, compensations and charges.

8. As between a lessor owning and a lessee operating company, the question of reasonable rates is always referable to the operating company.

9. The commission cannot subject the lessor company to the duties or liabilities of operating companies or to function as such companies; nor can it compel a public service company to lease its franchise or property or fix a rental therefor.

10. The commission can exercise no authority over a public service company not directly given by the act, and it must relate to some duty imposed by the act on the company investigated; hence it could not impose the duties of an operating company on a lessor or owning company, though the latter be a public service company.

11. When the lessor is paid a certain sum as rental for its entire property, such payment cannot be investigated by the commission simply because the lessor is a public service company, or under the guise of a duty enjoined to charge reasonable rates, fares and compensation. The latter refers to operating lessee's activities.

12. Public service companies expressly given the right to lease have not had such right taken away by the act; moreover, their substitutes, the lessees, are recognized as lawfully competent and able to carry out the lessor's charter requirements.

13. The duties originally imposed on the lessor companies must be worked out through the operating lessee companies, and, as to reasonable rates, the result may be that, through the process of valuation, the underlying lessor's property (rental) may be reached.

14. The public is not interested in every act producing revenue for an operating company's treasury, but only such which have a direct relation to public duties and liabilities.

15. To establish equality of rates, or to prevent discrimination in classification, contracts for a term of years, wherein rates differ from those within the same classification, filed or fixed by the commission, must yield to this lawful schedule for that service.

16. Where one public service company sells its commodity or service to another like company, and a charge is lodged against the rate for such service, the complaint must be made and acted on as any other complaint having due relation to earnings from all services and costs, capital and operating.

17. Where a bridge company by contract grants for a term of years to a street railway company the right to lay and maintain its tracks upon a portion of the bed of the bridge, receiving therefor an annual rental fixed by the number of cars and passengers moved over the bridge, and the bridge company collects tolls from other vehicles and foot passengers, both companies are operating companies, and the Public Service Commission has jurisdiction to pass upon the reasonableness of the rental paid by the street railway company to the bridge company, but in doing so it must consider

the earnings of the bridge company from all services and costs, capital and operating.

18. To justify a reduction in a rate where no valuation has been made, there should be some reasonable scientific method which, in itself, bears some relation to fixed and operating charges and returns from all services. If the operating service cannot bear a profitable return, the general revenue must be considered in order to prevent confiscation.

19. In such case, it is improper to take undue profit, if any, from other services, pedestrians and vehicular traffic, and apply it specially in reduction of the street railway company's service in ease of its operating expenses.

20. The Public Service Commission is not required, in all cases, to make a valuation in fixing rates.

21. With contracts, the commission, through the police power, has authority to secure reasonableness of rates or prevent discrimination.

22. But, in the application of the police power, confiscation cannot take place; in other words, public service companies are entitled to a fair return on their invested capital.

Argued April 25, 1921.    Appeal, No. 453, Jan. T., 1921, by plaintiff, from judgment of Superior Court, Oct. T., 1920, No. 130, affirming order of Public Service Commission, in case of New Street Bridge Company v. Public Service Commission of the Commonwealth of Pennsylvania and Lehigh Valley Transit Co.    Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.    Reversed.

Appeal from judgment of Superior Court.    See 76 Pa. Superior Ct. 6.

The opinion of the Supreme Court states the facts.

The Superior Court affirmed the order of the Public Service Commission.    Complainant appealed.

*Error assigned,* inter alia, was judgment, quoting it.

*George R. Booth* and *William W. Porter,* for New Street Bridge Co., appellant.—The contract was not a public service contract.    Cases are cited to show that

contracts have been destroyed by the exercise of the police power of the state extended to protect the public health, safety, morals or the general welfare. In every instance the contract was a clear public service contract which effected a discrimination or preference against one or more and in favor of some one or more.

The transfer of about six thousand dollars per annum from the bridge company to the Lehigh Valley Transit Company is of no interest or benefit to the public. No "patrons" of the bridge company are discriminated against by reason of the contract between these two companies: Philadelphia v. Scott, 81 Pa. 80; Lawton v. Steele, 152 U. S. 137; Beaver County v. Traction Co., 229 Pa. 565; Point Bridge Co. v. Ry., 230 Pa. 289.

*Reuben J. Butz,* of *Butz & Rupp,* with him *Thomas J. Perkins,* for Lehigh Valley Transit Co.—The question is no longer an open one as to whether rates of public service companies fixed in contracts for definite periods must yield to the regulatory power of the commission. The question has been decided by the commission adversely to the contract in many cases, which include the following: Pottsville, etc., T. Co. v. Public Service Commission, 67 Pa. Superior Ct. 301; Foltz v. Public Service Commission; 73 Pa. Superior Ct. 24; Scranton v. Public Service Commission, 73 Pa. Superior Ct. 192.

Public bridges are portions of the highways which crossed them: Rapho & West Hempfield Twp. v. Moore, 68 Pa. 404; Penn Twp. v. Perry County, 78 Pa. 457; Pittsburgh & West End Pass. Ry. v. Bridge Co., 165 Pa. 37; Berks County v. Ry., 167 Pa. 102; Beaver County v. Cent. Dist. P. & T. Co., 219 Pa. 340; Beaver County v. Traction Co., 229 Pa. 565.

The bridge company is an operating company: Franke v. Fuel Supply Co., 70 Pa. Superior Ct. 446.

The appeal should be restricted to a consideration of the reasonableness of the rate: Franke v. Fuel Supply

Co., 70 Pa. Superior Ct. 446; Fayette County Gas Co. v. Pub. Service Com., 70 Pa. Superior Ct. 472.

*John Fox Weiss*, with him *Frank M. Hunter*, for Public Service Commission, appellee.—The contention of appellant that the service rendered by it to the transit company is private and contractual in character, cannot be maintained under the decisions of this court: Pittsburgh & West End Pass. Ry. v. Bridge Co., 165 Pa. 37; Berks Co. v. Ry., 167 Pa. 102; Reading City Pass. Ry. v. Berks County, 246 Pa. 44.

If the service rendered by appellant is a public service, the contract does not preclude the commission from inquiring into and determining the reasonableness of the rates provided therein: City of Scranton v. Pub. Service Com., 268 Pa. 192; Suburban Water Co. v. Oakmont Borough, 268 Pa. 243.

The finding, determination and order of the commission was just and reasonable under the evidence.

OPINION BY MR. JUSTICE KEPHART, July 1, 1921:

The New Street Bridge Company, appellant, hereinafter called the bridge company, was incorporated by Act of May 3, 1864, P. L. 687. In 1867 it built a bridge from New Street in the Borough of Bethlehem, across the Lehigh River and the Lehigh Coal & Navigation Company Canal, to New Street in South Bethlehem. As originally constructed, the bridge cost $63,150. It is 1,473½ feet long, 30 feet wide, including a roadway of 18 feet and two foot passages of 6 feet each, and is supported by two abutments and eight piers. The bridge, since then, has been practically rebuilt, and is to-day a steel and concrete structure. In 1892 the bridge company made a written lease with the Allentown & Bethlehem Rapid Transit Company for the use of a part of the bridge. In 1910 the Lehigh Valley Transit Company, hereinafter called the transit company, intervening appellee, became the successor of the several street rail-

way companies, lessees of the bridge company. Its lease was for a period of twenty-two years and granted the sole and exclusive right to cross the bridge with street cars. The amount of annual rental was fixed by the number of cars and passengers moved over the bridge; for each passenger one-half of a cent was to be paid, and for each car ten cents, with the minimum rental of $750 per year. The transit company charged a rate to each passenger using its cars over the bridge an additional fare of one-half cent. This was covered by a supplemental ticket sold in connection with fifty and sixty strip and commutation tickets to Allentown and Hellerstown. The Borough of Bethlehem, now City of Bethlehem, filed a complaint against the transit company, charging excessive rates to the citizens in using this bridge. The Bethlehem Steel Company filed a like complaint. The transit company filed a complaint against the bridge company, averring its rate of one-half cent was unjust and unreasonable. The bridge company demurred to the complaint for the reasons hereinafter stated, the commission overruling the demurrer. An answer was filed, hearings had, and the commission ordered the rate reduced from one-half cent to one-third cent per person. From this order an appeal was taken to the Superior Court, and upon its affirmance of the commission's order an appeal was allowed to this court. The appeals of the Bethlehem Company and the City of Bethlehem against the transit company have been postponed, awaiting the determination of the order now before us.

The jurisdiction of the commission to determine the matter complained of is challenged for the reason that the bridge company is not a public service company, doing business in the particular matter under inquiry, within the meaning of the act, such as would make it subject to regulatory control. The position assumed comes to this: In the execution of the lease and subsequent performance thereunder, the bridge company was not functioning under its charter as an operating com-

pany, but had divested itself, through the lease, for a given term of years, of property and franchises, or the right or power to render service to the public. It had granted to the transit company the right to occupy, with its rails and wires, a portion of the bridge as a right-of-way, and, during certain scheduled periods of each day, yielded the exclusive occupancy of that part of its fixed and immovable property without any control on the part of the bridge company as to the manner or means of operation. For this sale and divestiture, they received compensation in the nature of a rental, fixed by car and passenger movement. This contract, they urge, was in the nature of a private contract relating to a private undertaking, as distinguished from one relating to a public duty affecting that part of the public having a right to demand performance of charter obligations; therefore the investigation undertaken by the commission was without authority of law, not being within the Public Service Act as a rate, charge or compensation. Appellant presents, among other cases, as closely analogous, the commission's ruling in underlying company cases from Pittsburgh. There lessors were made respondents because of rentals and invested capital in a complaint filed by the city against the operating company. The commission denied their right to so join the lessors because the contracts were private matters with the operating company: City of Pittsburgh v. Pittsburgh Railways Co., 8 Pa. Corp. R. 441.

For a proper determination of these questions it will be necessary to consider the general structure of the act as it relates to both companies, the jurisdiction of the commission as it attaches to certain acts done by these companies, and the joint exercise of charter functions which, by their nature, are common to both.

Article 1 of the Public Service Act defines the various companies subject to the commission's control; the extent of authority may be found in other parts of the act. This article also defines properties necessarily a part of

the life of certain public service companies. These must be considered in connection with the particular subject under inquiry, as they are, by the act and in practice, set into appropriate spheres of corporate activity. But it is not intended each corporation, named in article 1 as a public service company, is affected with these attributes. They become so when, in "doing business" under charter privileges, they meet what is comprehended therein.

Limiting our discussion to the present inquiry, the Public Service Act, taken in its entirety, clearly recognizes corporations which perform charter obligations in and of themselves. Such classes comprise possibly the largest part of the utilities in the Commonwealth. It also considers corporations which have parted with franchises and property by lease or otherwise, retaining merely a corporate shell, with given powers and privileges to be applied as occasion demands. These may be called lessor or owning companies. The act also assumes a defined control of the lessee or substitute; that is,—the company receiving, under authority of law, by lease or otherwise, the lessor's franchise and property, undertaking, by such lease and its own charter engagement, all the duties and obligations imposed on the lessor of performing for the lessor its charter responsibility to the State. Such lessee companies may be called operating companies. There may be, degrees of such leasing; we have been speaking of absolute withdrawal from all owning and operating activities or control. There are situations where the company not only owns but operates a part of the property devoted to public use, the remainder being leased to a different concern for operation. Many difficult questions may be presented bearing on these latter conditions; they are here mentioned as an aid in determining the matter before us. Where the lease is an absolute one of a given part of the company's holdings, the question is not difficult; where there is interchange of facilities or property, mixed with

operation in both concerns, it becomes more difficult to determine rights with respect to the public. Because of the complex question, and the relation to the various phases discussed, in addition to that heretofore mentioned we shall review the act as it relates to the different classes of corporations subject to regulatory control, and the applicability of relevant provisions to such concerns, eliminating any specific reference to the first class, above mentioned, with this observation: What may be said of the lessor and lessee, applies to such companies.

A lessor or owning company,—in the instant case a bridge corporation designated as a public service company by the act,—has certain duties and liabilities. These may be found in article II, section 1, (g), (h), (k), (l) and (t),—the duty to file contracts, make reports when demanded, furnish maps, profiles, records, etc., for the inspection of the commission, account for proceeds of securities sold, permit its physical property to be crossed by another railroad as ordered, and abide by grade crossing regulations as directed under the act. As lessor or owning company, it has certain powers and limitations of powers, found in article III, sections 2, 3, 4, 5, 6 and 11. These include the right to own property, receive rentals, pay dividends, acquire additional franchises, aid in financing new companies, build crossings, issue bonds, pave streets, and possibly others. It may be noted, in the duties, liabilities, powers and limitations of powers, there is no direct relation to an engagement in service to or for the public, except as to grade crossings. They relate specifically to circumstances in connection with corporate life, in which the public at large is only indirectly concerned. The commission may compel obedience to these duties when occasion arises, or they may be inquired into by complaint if acts are done contrary to law or the order of the commission, as may be noted in article V, particularly sections 12, 14, 18, 19, 21 and 22. But such skeleton concerns are none the less public service companies, charged with these duties, lia-

bilities and powers without the right or capacity to function for all the purposes of their original incorporation. Therefore the terms (article 1) "common carrier," "conveyance of passengers or property," "service," "facility," and the like, cannot be applied to such passive bodies, having no active duties to perform as they relate to the public, or in which the public has any direct interest; they are merely dry title-holders in the chain that goes to make up the entire title as it is ultimately found in the operating company, which uses and operates them for the public convenience.

A lessee-operating company receives and owns for a given time all franchises and property of every kind and character of the lessor company; it has, in addition to those already mentioned, certain duties and liabilities (article II, section 1) different from those of the lessor company. Lessees must furnish adequate service to the public at just and reasonable rates or compensation; make repairs, alterations and improvements in the service and facilities for the accommodation of the patrons and the public; file tariffs and schedules showing charges, rates and compensation, which must be posted in their places of business, depots, stations, bridges, etc.; make joint rates, and, except as specified in the act, make no changes in a tariff or schedule. Not any of the duties just mentioned are obligatory on a lessor company; it has sold its power and right to do these things, and can regain these rights and powers only on the happening of a condition, viz, surrender, cancellation or annulment of lease. An operating company has powers (article III, section 1) that a lessor company does not have: the right to demand and receive reasonable fares, rates, tolls, charges and compensation for service rendered; to post, publish and file rates; to classify these rates and to increase them; to complain against other public service companies,—and of course it may be complained against. The powers and limitation of powers incident to a lessor are in the lessee.

A lessor company could not file and post as a schedule an increased rental, and, on complaint, seek the aid of the commission to enforce such increase on the basis of public concern. The commission has ample power to enforce the provisions relating to operating companies: article V, particularly sections 2, 3, 4 and 5.

The present complaint deals with rates, fares and compensation, and this is the avenue through which the public and complainant must pass to reach the lessor. But as to rates, fares and compensation, the commission's authority is effective only against such companies as deal in rates, fares, compensations and charges for service to the public; in short, operating companies. It is to such companies the terms (article I) "common carrier," "conveyance of passengers or property," "service" or "facility" may be applied with full force. They are apt words; they fit in well to the life and activities of such companies.

The commission has no power to subject lessor or owning companies to the duties or liabilities of operating companies. Its power to enforce obedience is circumscribed by the act, and is comprehended in the simple phrase mentioned in article VI, section 6: "Done or about to be done, omitted or about to be omitted......in violation......of the act." An owning or lessor company cannot be compelled to do things made impossible, —to operate or to function as an operating company,— any more than the bridge company could be compelled to act as a telephone or water company. Such owning company owes no duty to the public to lease its road or bridge, or to fix a rental therefor. When such company, before the enactment of the Public Service Law, fixed a rental for its entire property and franchises for a term of years, it had not then, nor has it since, done anything prohibited, nor left undone anything required. The law gave it the right to name a substitute to perform its acts, and the legislature recognized this right. Having divested itself of its franchises and facilities, it cannot

render service of any kind, such as carrying passengers; it cannot establish rates or fares, or receive compensation for such fares; in fact, it has none of the powers of an operating company. A lease may indeed provide that certain burdens, usually attached to and a part of an owning company, shall be borne and met by the leasing company; but these are matters of detail and merely incidental to the lease itself; we need not concern ourselves with such situations.

When we seek the powers of the commission to investigate a given complaint, it must be referable to some duty or limitation of powers imposed by law on the company to be investigated; the public, by legal enactment, is concerned only with the nonfulfillment of its duties or with unlawful encroachment of powers. Upon cause shown, whether against an owning company or an operating company, the investigation must be limited to the nonperformance of the obligations specifically imposed by law on each concern. As the lessor company could not operate, it could not be affected with any duties of the operating company, nor can it be complained against in relation to these duties; and, because it is paid a certain sum as a rental for its entire property, that sum cannot be inquired into under the guise of a duty enjoined upon an operating public service company (charging reasonable rates), merely because the owning company is, for certain purposes, and all its living purposes, a public service company.

But it is urged that, inasmuch as these companies procured a right from the State to serve the public, they cannot divest themselves of this undertaking and impose it on a substitute, but are primarily liable to the Commonwealth to perform their charter obligations; that inasmuch as the State always had within it the right to regulate and control public service companies, when it exercised that right it gave the commission power and authority to take hold of the companies liable in the first instance, to wit, owning or lessor com-

panies, and compel the substitute, through it, to perform the charter obligations. It must be remembered, however, that while this right did exist in the State, the same power and authority by legislation authorized these several companies to lease their corporate property and franchises; it gave them the right to sell or lease to another, and recognized the other as competent and able to carry out the original charter requirements of the first or lessor companies. Having placed its seal of approval on such acts, it did not, through the Public Service Act, attempt to disturb them, take away their authority or place lessors in the position of first responsibility as claimed, but the act expressly recognized such leases, and further granted to the commission the right not only to control and regulate them as hereinbefore discussed but to permit public service companies to lease corporate properties, rights, facilities and franchises to other companies, so that a lessee company, as here, will be subject to the act as fully as though such lease had been made before the act.

The duties originally imposed on the lessor companies must be worked out through the operating company and indeed they may have such an effect that, through process of valuation, the underlying lessor's property may be reached. To secure adequate service at reasonable rates may entail a fair valuation of lessee's property, used and usable, and therein will be included every item of property and franchise owned by lessor and lessee, and mentioned in the lease; a fair return upon such property may so materially diminish the receipts that the lessor company may be vitally affected. This adjustment can and may be speedy, and where the lessor absorbs all the profits, so that the lessee cannot operate, if the public is unjustly affected, relief may follow quickly. The public is not concerned with a good or bad bargain between lessor and lessee. What they do demand in a complaint such as this,—and have a right to demand,—is adequate service at reasonable rates, and

no more. This is worked out through the duly created substitute on the ground, in visible ownership and occupation of everything in which the public is vitally interested.

Viewing the question, then, in this light, if the bridge company had leased its entire property and franchise, or had leased a certain part of its property, absolutely to the transit company, divesting itself of all control over the property and franchise for operating purposes for a given time, it would not be within the power of the commission, in a direct proceeding against the bridge company, the underlying company, to reduce the rental. But the bridge company does not meet either specification. There is no unqualified surrender of its property and franchise, or any part of them. To what extent short of these, if any, may the relation of the lessor and lessee exist, so that rentals may be exempt from regulatory control and the compensation paid be beyond inquiry? It is difficult to lay down a rule that would meet each case. A corporation created for public purposes and devoting its property to public uses, may do many minor acts in connection with its major purpose that are not necessary or related to such public duty, but may be incidentally or collaterally connected with the duty of performance of charter obligations. Ground is necessary for tollhouses and depots; it is lawful to lease to individuals land not in actual use or that can be spared therefrom; such leasing is a purely private contract. There are other acts not indispensable to a fulfillment of charter undertakings that may be exempt. It must be borne in mind, every point of contact, having a close relation to duties and liabilities under the act, between the public as such and a public service company, are made subject to regulation. In the instant case, as between bridge company and transit company, there is a dual control of the operating agency. Both companies jointly use the roadbed. They jointly perform the obligations of their respective charters, and as such are oper-

ating companies to all intents and purposes within the meaning of the act, subject to the regulatory control applicable to such companies, a control that permits the commission, on complaint filed, for nonperformance of the duties imposed under article II, section 1, to inquire into the reasonableness of the rates of either company, though such rates may be in the nature of a cost per person and car, a per diem charge, a weekly charge or a yearly charge. It is closely allied to a traffic agreement.

When the bridge company made its lease with the transit company, it was carrying out the purposes of incorporation. It had a highway for people and movable property to cross the river; it permitted that highway to be used in part and at stated intervals by the transit company. This use could not be called exclusive; it would be exclusive only while the car was moving across the bridge, and such reasoning could be applied to any vehicle traveling thereon. True, it enabled the transit company not only to perform its charter requirements, in getting people over the river, and permitted it to connect with its railway at either end of the bridge, thus, by a continuous route, meeting its further demand of service to the public; but the bridge company operated over the same right-of-way; the highway was open for public travel the entire length and breadth of the bridge and was interfered with, so far as the transit company was concerned, only when a car was traveling across it. In this position, however, the transit company occupied no higher place as to the bridge company than a motor car, a buggy or a foot passenger crossing the bridge, even though the transit company was operating on the bridge and fulfilling its charter requirements. There was not a total severance of charter responsibility on the part of the bridge company. It had not so divested itself of property and franchises as to be exempt from control. The bridge company was functioning for all purposes as an operating company, and it was doing this when the lease was executed. The carriage of passengers by the

street car differs only in degree from that of the taxi-cab,—each carriage of passengers under the lease was in continuation of the exercise of the franchise by the bridge company. The mere fact that the public, when riding on the transit cars, does not come in contact with the bridge company, will not change the situation. The same may be said of the passenger inside the taxicab. That the bridge company may not have been compelled to lease is not material.

As to the transit company's right to be on the bridge, the question is not so much how it gets there, as that the commission found it there; its right to be there cannot be tested here, nor will the fact that it was there under a lease hinder an adjudication to compel adequate service at reasonable rates against the bridge company. If it should be determined by the commission, after due hearing, the rate for this class of service is high and its result affects an arrangement between the bridge company and someone else, the reduced rate is none the less the lawful rate and the only rate that can be charged for that service, even though it does incidentally reduce the terms of a consumer's contract. We agree with the Superior Court, the right to occupy the bridge did not depend on the lease alone. The structure was dedicated to public use, and, having held its property open for such service as street cars, it cannot now, at least during the life of the lease, deny the right of the company to be there.

Assuming this to be a service charge, as it is, within what limits may the commission regulate such contracts? Although a service charge, it is part of a contract in writing between the parties. We need not review the authorities sustaining the power of the commission as a government agency to control contracts of this nature, or to exercise regulatory control over service companies: Relief Electric Light, Heat and Power Company's Petition, 63 Pa. Superior Ct. 1; German Alliance Ins. Co. v. Lewis, 233 U. S. 389; Chicago and Alton R.

R. Co. v. Tranbarger, 238 U. S. 67, 76; V. & S. Bot. Co. v. Mountain Gas Co., 261 Pa. 523; Scranton v. Pub. Ser. Com., 268 Pa. 192. To establish equality of rates, or to prevent discrimination in classification, written contracts for a term of years—wherein rates differ from those within the same classification, filed or fixed by the commission,—must yield to the lawful schedule created for that service. In reaching the conclusion that the police power embraced such contracts, this court has considered the rate affected, as it related to the general scheme of rates. of a given public utility. That was the test. In no instance did it attempt to strike down a contract merely because a particular consumer felt it was too high or that it might appear so as an operating charge to his business. Nor can we now adopt this view. It seems the modern tendency is to broaden the scope of the police power; it is now out of the question to hazard a definition of it, or even to decide that affirmative action on the question indicated may not be declared a lawful exercise of this power. Judges, in other days, said it was for the benefit of the common weal in furtherance of morality, health, safety, general prosperity, and the like; but it is growing to be regarded, by some, more as the handmaid of socialism, without reference to any of the great fundamental principles on which organized society rests. The justification for the exercise of police power over these companies and their contracts was that their business occupied a peculiar position on the highways of the Commonwealth, interwoven with the public life, and of a nature essentially monopolistic in character, compelling the public to be its customer whether it would or not; it operated under charters and laws with certain governmental powers not given to ordinary companies. Indispensably a creature of the State, it dealt with the public directly and the public had to deal with it. As to the extent of regulation, this court has consistently held neither the commission nor the legis-

lature could enter the field of public service activity unless it was for the benefit of the public generally, and then only after a fair return was made to the company, or, in other words, in the application of the police power, confiscation could not take place. Here we have one public service company complaining because its operating cost is increased through the excessive rate of another public service company, and asking the rate be reduced. Not that the public will benefit if a reduction of such rate is ordered, but the former company will earn more money; and the commission,—without considering the effect of unwarranted earnings by the furnishing company in association with other schedules or classifications of service, and, without any attempt at allocation of operating and capital cost producing the services, or other adequate reason,—reduces the rate of one class of service 33 1-3 per cent affecting a total reduction of more than one-sixth the gross revenues. While the issue was directed to the rate for this service, the receipts from rates and expenditures from all services were produced and considered, and from them it was determined the company earned too much money, without any fair value found on which to calculate earnings, or any idea advanced as to what the earnings should be. Its capital stock might have been low, the earnings from 1869 to 1906 applicable to dividends were less than the stockholders were entitled to, and the bridge may have been rebuilt to meet this new traffic from these and other earnings. Because stock account was not increased to meet capital charge, is no reason to deny the right to earnings on capital charge or fair value. Though the gross receipts from the special service was fifty per cent approximately, of the total, with no division of operating charge or capital outlay to produce such service, the commission, without any apparent reason, gives the transit company the benefit of all the excess earnings; on this showing it might be entitled to only one-half such benefit. But this may have been because consumers in

other classes did not ask for reductions. Such determinations work discrimination among different classifications of service. By calculating the number of passengers and increased receipts in all services, without some idea of cost, it cannot be determined which service is more remunerative. On the space occupied,—one-third the bridge surface,—it is idle to say the proportionate division of charges should be made on such basis without some evidence tending to show capital outlay and operating charges were to be thus apportioned. Evidence was not given in relation to such division, and the statement,—at best a mere guess based on no computation or estimate,—is wholly unsatisfactory and insufficient. Before the transit company built its line over the bridge, its carrying capacity was intended for ordinary traffic limited to two or three tons, and foot passengers. When the transit company's cars, weighing from twenty to forty tons, were used, the bridge had to be strengthened to increase the carrying capacity for such cars. An apportionment of cost may reveal that, while the use was of one-third of the surface space, the capital cost to produce transit service may be fixed at a higher percentage, with corresponding deductions for repairs, etc. Counsel for appellee realized the importance of what has been discussed, as will be seen by the statements and requests during the course of the hearing; but the burden of proof was on complainant to show these items; it could have forced respondent to submit the figures or resorted to expert evidence of cost and proper distribution.

Where a public service company sells its commodity or service to another like company, and a charge is lodged against the rate for such service, the complaint must be made and acted on as any other complaint having due relation to earnings from all services and costs, capital and operating, and not merely to find, without more, "respondents were able to pay from its receipts dividends which we deem more than a just return."

It is true, as the commission states, it is not necessary to make a valuation in every rate case; so also it is undoubtedly true a specific rate may be complained against and a just rate fixed without valuation. But there should be some reasonably scientific method which, in itself, bears some relation to fixed and operating charges and all services, to justify the conclusion. If the particular service cannot bear a profitable rate, then, to prevent confiscation, the general revenues must be considered. But here undue profit, if any, is taken from pedestrian and vehicular traffic and applied in ¬eduction of the transit company's special service in ease of its operating expense. We do not wish to impose any unnecessary burden on the commission or require expensive valuations when they can be avoided, but the record and report, in all fairness, should justify the conclusion reached. We agree with the commission's finding: "There is, however, no provision in the law, nor any ruling of any court or commission, which makes it obligatory for the commission to determine a fair value as a rate base before it can reach a finding as to what constitutes a just and reasonable rate." This is a correct statement of the law. The report then proceeds: "Many findings as to the justness of rates have been made without basing the same on a valuation and where, as in this case, the inquiry is directed to one out of a group of rates, a valuation is not required or advisable." But some standard must take its place,—some rule developed from experience and approved by general use. There is absolutely nothing in the record to justify reducing the rate from one-half to one-third of a cent per passenger. We may observe, the net revenue of the bridge company was, in round number, $18,000 a year; the fair rate-making base of one engineer was, in round numbers, $236,000, another $269,000, and a third, the lowest, $149,000. If we assume a valuation between these figures, allowing a fair return on invested capital, depreciation, replacements, repairs and operating ex-

penses, the net return would not be too high. But the commission did not consider this phase of the case; it is therefore only proper the matter should be again referred to them.

. We conclude there is not sufficient in the record to justify the order made. While there was some evidence as to probable cost, there was no attempt at allocation on any theory that could justify the order. There is nothing to support a conclusion that this service was more profitable than others, or that it should have been preferred for the deduction of excess earning. The company may be earning too much; it should be told, when one-sixth of its revenue is cut off, how much it could earn, or the basis on which it can be found. The total revenue was $34,000. This is cut to some $28,000, and the total decrease taken from the special rate of the transit company.

The order of the Superior Court is reversed, as is that of the commission. The case is remitted to the commission with directions to reconsider the matter, proceed to hearing and make such order as provided by law; appellee to pay costs.

See also the next case.