# Commonwealth v. Delaware River Railroad and Bridge Company

*Manuel Kraus*, Deputy Attorney General, and *Charles J. Margiotti*, Attorney General, for Commonwealth.

*John McI. Smith* and *D. P. Williams*, for defendant.

Fox, J., January 9, 1939.—This is an appeal by defendant from the settlement of an account against it for a tax on the privilege of doing business in this Commonwealth under the Corporate Net Income Tax Act of May 16, 1935, P. L. 208. It has been submitted to us for trial without a jury.

We find the facts as follows:

*Facts*

1. Prior to the incorporation of defendant company, to wit, on or about February 1896, there was existing in the Commonwealth of Pennsylvania a corporation by the name of Pennsylvania & New Jersey Railroad Company,

and a corporation by the same name in the State of New Jersey, both under statutory authorities.

2. In the year 1896 a consolidation and merger took place by and between these two corporations and a copy of the said agreement was filed with the Secretary of the Commonwealth, as required by the Act of March 24, 1865, P. L. 49; a copy was also filed, in accordance with the statutory requirements, in the State of New Jersey, and the resultant of the consolidation or merger was defendant company, with the same powers as the parent companies, which were the building, operating, and maintaining of a railroad.

3. Defendant company operated the railroad which consisted of two miles in Pennsylvania and seven and fifty-two hundredths miles in New Jersey, making a total mileage of nine and fifty-two hundredths; and this was operated by defendant company until on or about March 13, 1918, when, with the consent, as required by law, of the Public Service Commission of Pennsylvania, it leased to the Pennsylvania Railroad Company, a copy of which lease was filed in the office of the Secretary of the Commonwealth of the State of New Jersey, all its property for a period of 999 years and delivered possession of the same; and also leased all its corporate rights, franchises, and privileges to defendant to be managed and exercised by the said defendant for the proper maintenance, use, operation, and management of the railroad and property aforesaid, the only property defendant possessed; the consideration therefor being the payment of an annual rental by the lessor to the lessee of a sum equivalent to six percent of actual par value of the capital stock issued and outstanding on April 1, 1918, and any stock issued subsequent to that date.

4. The said lessee has been in absolute possession and operation of the said railroad and has exercised from the time of the lease to the present time and in the year 1935, the pertinent tax year in this case, all the franchise and

privileges of the said lessor and has paid all the rentals as provided for in the lease.

5. In February of the year 1935, the stockholders of defendant corporation held a meeting in the statutory office in the State of New Jersey, the only business done at that meeting being the approval of the annual report of the president and board of directors for the year ending December 31, 1934, and the election of directors to serve for the ensuing year.

6. The directors elected for the year 1935 held one meeting during the year at which meeting, held in Philadelphia, Pa., the only action taken was the election of officers for the ensuing year, the approval of the minutes of the meeting of the previous board, the approval of the statements of additions and betterments authorized by the lessee during the months of March and April 1934, and the approval of other matters done in the last-mentioned year.

7. The sole income of defendant during the year 1935 was the rental paid by the lessee under the terms of the said lease, which was $78,000.

8. The outstanding capital stock in the year 1935 amounted to $1,300,000, and the dividend thereon, paid by the lessor, was $78,000.

9. The bonded indebtedness of defendant was then $1,-005,000 and the interest thereon amounting to $40,200, was paid by the lessee to defendant and was deposited by defendant during that year and paid to the bondholders.

10. Defendant had no bank account in Pennsylvania except a small amount of money on deposit with the lessee upon which no interest was paid; it had no receipts from any transportation business.

11. The gross receipts report for the year was filed by the lessee for defendant with the Commonwealth, showing that no gross receipts tax was due and none was paid by defendant.

12. Additions and betterments to the leased premises in the year 1935 were made by the lessee, which, under

the terms of the lease, were paid by it and charged to defendant during the year 1935 with the consent and approval of defendant.

13. During the said year defendant had completely refrained from constructing, operating, and maintaining a railroad which was the principal purpose of its incorporation; and the activities of defendant corporation had been reduced to holding property subject to the said lease and the distribution pursuant to the terms of the said lease of income therefrom, and doing only the necessary acts for the preservation of that statute. It exercised no privilege of doing any business within the Commonwealth of Pennsylvania during the material year.

*Discussion*

The settlement of the tax made by the Department of Revenue is under the Corporate Net Income Act of 1935, supra. The said act is an act entitled, "An act to provide revenue for State purposes by imposing an excise tax, for a limited period of time, on the net incomes of certain corporations," etc. In section 2 there is a definition of corporations applicable under this act. By section 3 there is a provision for the imposition of a tax, which provides:

"Every corporation shall be subject to, and shall pay for the privilege of doing business in this Commonwealth, a State excise tax at the rate of six per centum per annum upon each dollar of net income of such corporation."

There is no objection as to the measure of the tax. Defendant concedes that if the facts bring it within the terms of the act it is liable to the tax, but it contends that they show that it is not doing business in any way, as provided by the terms of the said act, creating liability for the tax.

The Act of June 7, 1879, P. L. 112, is an act entitled "An act to provide revenue by taxation", and in section 4 thereof it is provided:

"That every company or association whatever, now or hereafter incorporated by or under any law of this com-

monwealth, or now or hereafter incorporated by any other state or territory of the United States, or foreign government, and doing business in this commonwealth, or having capital employed in this commonwealth in the name of any other company or corporation, association or associations, person or persons . . . shall be subject to and pay into the treasury of the commonwealth annually, a tax . . .". The act then provides for the method and measure of exacting the tax, somewhat similar to the Act of 1935, supra.

The question before us is the construction or the meaning of the words used in section 3 of the instant act, which provides as follows: "for the privilege of doing business in this Commonwealth".

Five cases involving the construction of these words, "doing business", have been decided by this court. They are the cases of Commonwealth v. Standard Oil Co., 101 Pa. 119, Commonwealth v. Conglomerate Mining Co., 1 Dauph. 85, Commonwealth v. American Bell Tel. Co., 129 Pa. 217, Commonwealth v. Lycoming Improvement Co., 6 Dauph. 103, and Commonwealth v. Tonopah Mining Co., etc., 12 Dauph. 95. In the last-mentioned case there was an attempt on the part of the Commonwealth to tax a foreign corporation, which maintained in this State an office for the purpose of making transfers of stock and which kept a deposit in a bank in this State, but whose corporate business was carried on in another State. Kunkel, P. J., in his discussion, quite fully reviewed these cases (except the fourth) and at pages 98 and 99 said:

". . . In the case of Com. vs. Standard Oil Co., 101 Pa. 119, decided by this court and affirmed by the supreme court, it was said by Judge Simonton: 'The Act of May 1, 1868, seems to use the phrase "go into operation" as synonymous with "doing business," and this must mean more than purchasing supplies in the state through agents (P. L. 1868, p. 108) ; so the Act of June 7, 1879 (P. L. p. 112), enacts that no corporation, chartered by this or any other state, and "doing business" in this common-

wealth, shall "go into operation" without first making certain reports; thus making "doing business" equivalent to "going into operation"; and in section 16, p. 120, foreign corporations which do not "invest and use" their capital are required to obtain and pay for a license, thus making "invest and use its capital" another equivalent for "doing business" '. Also in Com. vs. Conglomerate Mining Co., decided by this court and reported in 1 Dauphin Co. Reports, 85, it was held that the mere ownership of real estate in this state by the defendant company not used in carrying on the business authorized by its charter was not an investment and use of its capital within the commonwealth so as to exempt it from payment of the license fee required by the Act of June 7, 1879, and subject it to the payment of a tax upon its capital stock. In that case Judge McPherson, referring to the Standard Oil case, said: 'Judge Simonton has pointed out, in the case of Standard Oil Company, that "doing business", the "investment and use of capital", and "going into operation", are employed in the act of 1879 as substantially equivalent terms, and we do not doubt that this suggests the true answer to the argument now made. The legislature did not intend to tax upon their capital stock foreign corporations who exercised no corporate activity in this state, who did not, in some degree or in some manner, direct or indirect, carry out here the purpose for which they were created. What is meant by going into operation, doing business, investing, using, or employing capital when that language is used about a corporation? Certainly as it seems to us, it can only mean doing business as it has undertaken, using and employing its capital for that purpose, conducting the operations its charter authorizes.'

"And in Com. vs. Bell Telephone Co., 129 Pa., 217, which was an appeal from this court and was affirmed by the supreme court, Judge Simonton said. 'The mere ownership of property in the state, by a foreign corporation, does not render it liable to the tax on capital stock; it must

be "doing business", or "having capital employed", in some manner; or it must "invest and use its capital", within the state. As said in the case last above cited, it must be, in some manner and degree, exercising its corporate powers within the state.'

"It would, therefore, seem from those cases that the term doing business in the state, 'or having capital or property employed or used' in the state, as found in the acts of assembly which are the warrant of the commonwealth for the present claim, is to be interpreted to mean the employment, or investment, of capital, or the use of property in the state representing its capital stock by the foreign corporation in the exercise of some corporate activity." And as a matter of law, he concluded (p. 100) :

"1. That the defendant was not doing business, nor employing, or using, its capital, or property, in the year 1906, in this state, within the meaning of those terms as used in the Act of June 1, 1889, (P. L. 420), and the amendatory Acts of June 8, 1891 (P. L. 229) and June 8, 1893 (P. L. 353) ."

In the case of New Street Bridge Co. v. Public Service Comm. et al., 271 Pa. 19, the court considered at length corporations which had parted with their franchises and privileges, by lease or otherwise, retaining merely a corporate shell on the duties and liabilities of a lessor owning company, and at pages 29 and 30, inter alia, said:

". . . An owning or lessor company cannot be compelled to do things made impossible,—to operate or to function as an operating company,—any more than the bridge company could be compelled to act as a telephone or water company. Such owning company owes no duty to the public to lease its road or bridge, or to fix a rental therefor. When such company, before the enactment of the Public Service Law, fixed a rental for its entire property and franchises for a term of years, it had not then, nor has it since, done anything prohibited, nor left undone anything required. The law gave it the right to name a substitute to perform its acts, and the legislature recog-

nized this right. Having divested itself of its franchises and facilities, it cannot render service of any kind, such as carrying passengers; it cannot establish rates or fares, or receive compensation for such fares; in fact, it has none of the powers of an operating company. A lease may indeed provide that certain burdens, usually attached to and a part of an owning company, shall be borne and met by the leasing company; but these are matters of detail and merely incidental to the lease itself; we need not concern ourselves with such situations."

In the case of Attorney General v. Boston & Albany R. R. Co., 233 Mass. 460, 124 N. E. 257—a case somewhat similar to the instant one—defendant was organized as a corporation under the statute law of Massachusetts by the consolidation of the Boston & Worcester and the Western Railroad Corporation, and was empowered to maintain and operate a railroad, which it did until 1900, when it leased its entire property to the New York Central Railroad Company for 99 years. It was held "not doing business for profit" within the statute imposing a tax on corporations so engaged, in an opinion by the Supreme Judicial Court of Massachusetts, wherein Rugg, C. J., at page 463, said:

"A franchise to be a corporation was granted to the defendant for the purpose of building and operating a railroad for the accommodation of the public. That was the dominant aim of its organization. It could not, merely of its own volition, sell, mortgage or lease its property or franchise in such way as to deprive itself of the power of accomplishing the ends for which it was created. *Attorney General* v. *Haverhill Gas Light Co.* 215 Mass. 394. *Richardson* v. *Sibley,* 11 Allen, 65. *Middlesex Railroad* v. *Boston & Chelsea Railroad,* 115 Mass. 347. *Davis* v. *Old Colony Railroad,* 131 Mass. 258, 271. Leasing of its entire property was not one of these ends. The approval of the Commonwealth was a prerequisite to the validity of the lease of the defendant. That lease so approved stripped the defendant of power to operate its railroad and to per-

form most of the public services which justified its corporate existence. 'The question is rather what the corporation is doing than what it could do.' *United States v. Emery, Bird, Thayer Realty Co.* 237 U. S. 28, 32. Manifestly the defendant is not now doing the main business for which it was organized. All its powers as a railroad are not abrogated and annulled by the lease and the statute. It still holds railroad properties under lease to itself, remains bound by the terms of such leases and pays the stipulated rentals. It still possesses power to issue bonds and to take property by eminent domain. It exercises that power. Although I am not free from doubt on this point, the courts are of opinion that these limited corporate functions remaining to it, which it still exercises, are not a doing of business for profit. The seizure or purchase of property at the request of the lessee in accordance with the obligation impressed on the lessor by the terms of the lease and the approving statute are necessarily for the benefit of the lessee. Whatever profit there may be accrues wholly to the lessee. Improvement of the railroad property by taking land for increased trackage, the building of freight houses and stations, was for the advantage of the lessee. These acts do not redound in any particular to the profit of the lessor. They do not enable it to receive any additional gain or advantage beyond the rental reserved in the lease. Even as to these powers to exercise eminent domain and to issue bonds, it has no right of initiative. It can act in these matters only at the instance of the lessee. Its conduct is but an automatic reflection of determinations conceived, instituted and carried into final effect by the lessee. The exercise of these attributes by the lessor is the act of a naked repository of corporate power, dormant so far as any possibility of profit to itself is concerned.

"Under our law a corporation cannot be organized merely for letting a railroad. When a corporation established for the operation of a railroad is permitted by the sovereign power to retire utterly from that business, to

become wholly inactive respecting it, and to be simply the quiescent recipient of a fixed income from a single permanent investment, it is difficult to say with due regard to the meaning of words that such a corporation is conducting business for profit. Its charter has not been changed. The corporation is not authorized to embark in a new business. The lease, however, approved by the Commonwealth, is a surrender during that term of its ordinary powers as a railroad corporation and a transfer of its business activities to the lessee. That which it continues to do is not business for profit according to common understanding. It makes no further efforts in the pursuit of gain, because the Commonwealth has approved the suspension of all its profit making attributes and functions in return for a fixed revenue, all the expenses of the collection and distribution of which are borne by the lessee. It exercises none of the distinctive functions of a railroad corporation. Its corporate energy is reduced below the point of conducting business for profit."

In the case of Attorney General v. Ware River R. R. Co., 233 Mass. 466, 124 N. E. 289, which was a case similar to the instant one, it was said:

"During the time here material it did not issue stock or bonds or exercise the power of eminent domain. Its railroad was operated by the lessee up to the time of the lease of that company to the New York Central and Hudson River Railroad Company in 1899. Since then it has been operated by the latter company. The defendant has exercised no other faculties or powers"; and the court held that defendant was not liable under the statute as a Massachusetts corporation doing business for profit.

In the case of People ex rel. v. Gilchrist et al., 215 App. Div. 48, 213 N. Y. Supp. 307, the Supreme Court, Appellate Division, held that a corporation franchise tax cannot be imposed under the tax law, unless the corporation is exercising the corporate franchises and employs its capital stock or part thereof, and that a corporation which leased its plant and equipment for a long term, retaining

no interest therein and carrying on no business functions, except to receive rent and distribute it to its stockholders, did not employ its capital and was not subject to franchise taxes.

In the case of People of N.Y., ex rel., v. Sohmer, etc., 217 N. Y. 443, 112 N. E. 181, the question of doing business in the State arose and the property of appellant was under lease as in the instant case. The court, after a full discussion of the question, at page 451, inter alia, said:

"The appellant had the right and power, under its certificate of incorporation and the statutes, to operate the property and franchises it had acquired. It had the power also to lease them regardless of the statement in the certificate that it contemplated doing so. It was and had the powers of a railroad corporation as truly as though it were formed under the General Railroad Law. It could decline to enter into the operation of the railroad and to carry on the business of a railroad corporation. Assuredly its declination or failure to do the business was not 'doing business in this state.' "

In the case of Lewellyn, etc., v. Pittsburgh, B. & L. E. R. Co., 222 Fed. 177, the corporation attempted to be taxed upon its entire net income, etc., had leased its entire property, as in this case. It was held that it was not doing business such as made the lessor liable for the special excise tax imposed, and at page 184 the court said:

"From the decisions reviewed, it may be accepted as established that corporate acts performed by a corporation in the exercise of its primary franchises, as the maintenance of its corporate existence, do not constitute 'doing business' within the meaning of the statute, nor do corporate acts which relate strictly to the internal affairs of the corporation and which do not include the exercise of its secondary franchises. The statute, therefore, distinguishes between corporate acts and discloses an intention to impose a tax for the privilege of doing only those acts which constitute 'carrying on and doing business.' "

The case of Flint v. Stone Tracy Co., 220 U. S. 107, is one of the outstanding cases in the United States Supreme Court which we have observed and in which there were many questions raised and eminent counsel of the Nation participated. At pages 145 and 146 the court said:

"It is therefore apparent, giving all the words of the statute effect, that the tax is imposed not upon the franchises of the corporation irrespective of their use in business, nor upon the property of the corporation, but upon the doing of corporate or insurance business and with respect to the carrying on thereof, in a sum equivalent to one per centum upon the entire net income over and above $5,000 received from all sources during the year; that is, when imposed in this manner it is a tax upon the doing of business with the advantages which inhere in the peculiarities of corporate or joint stock organizations of the character described. As the latter organizations share many benefits of corporate organization it may be described generally as a tax upon the doing of business in a corporate capacity." And at pages 151 and 152 the court said:

"Excises are 'taxes laid upon the manufacture, sale or consumption of commodities within the country, upon licenses to pursue certain occupations, and upon corporate privileges.' Cooley, Const. Lim., 7th ed., 680.

"The tax under consideration, as we have construed the statute, may be described as an excise upon the particular privilege of doing business in a corporate capacity, i. e., with the advantages which arise from corporate or quasi-corporate organizations; or, when applied to insurance companies, for doing the business of such companies. As was said in the *Thomas Case*, 192 U. S. 363 *supra*, the requirement to pay such taxes *involves the exercise of privileges, and the element of absolute and unavoidable demand is lacking. If business is not done in the manner described in the statute, no tax is payable*." (Italics supplied.)

This case is quoted with approval in the case of Mc-Coach, etc., v. Minehill, etc., R. R. Co., 228 U. S. 295, in which case it was held that a corporation which has leased its railroad to another company, operating it exclusively, but which maintains its corporate existence and collects and distributes to its stockholders the rental from the lessees and also dividends from investments is not doing business within the meaning of the Corporation Tax Law of August 5, 1909, 36 Stat. at L. 11.

The facts in the last-mentioned case are quite similar to the facts in the instant case. Defendant had leased to the lessee its entire railroad and appurtenances of every kind, and all rolling stock and personal property of every description, as well as all its rights, powers, franchises (other than the franchise of being a corporation), and privileges which could then, or at any time thereafter during the time thereby demised, be lawfully exercised or enjoyed in or about the use, management, maintenance, renewal, extension, alteration, or improvement of the leased premises or any of them. The court at pages 303 and 304 said:

"From the facts as stated above it is entirely clear that the Minehill Company was not, during the years of 1909 and 1910, engaged at all in the business of maintaining or operating a railroad, which was the prime object of its incorporation. This business, by the lease of 1896, it had turned over to the Reading Company. If that lease had been made without authorization of law, it may be that for some purposes, and possibly for the present purpose, the lessee might be deemed in law the agent of the lessor; or at least the lessor held estopped to deny such agency. But the lease was made by the express authority of the State that created the Minehill Company, conferred upon it its franchise, and imposed upon it the correlative public duties. The effect of this legislation and of the lease made thereunder was to constitute the Reading Company the public agent for the operation of the railroad and to prevent the Minehill Company from carrying on business in

respect of the maintenance and operation of the railroad so long as the lease shall continue. And it is the Reading Company, and not the Minehill Company, that is 'doing business' as a railroad company upon the lines covered by the lease and is taxable because of it. The Corporation Tax Law does not contemplate double taxation in respect of the same business." And at page 305 the court said:

"It should be mentioned that there is nothing in the record to show that during the taxing years in question the company exercised its power of eminent domain, or put in force any other special corporate power, in aid of the business of the lessee. We therefore do not pass upon the question whether, if it should do so, it would be taxable under the act in question. We cannot, however, agree with the contention made in behalf of the Government that because the Minehill Company retains its franchise of corporate existence, maintains its organization, and holds itself ready to exercise its franchise of eminent domain, or other reserved powers, if and when required by the lessee, and ready to resume possession of the property at the expiration of the lease, it is therefore to be treated as doing business, in respect of the railroad, within the meaning of the Corporation Tax Law."

The learned Deputy Attorney General, representing the Commonwealth in the question before us, has cited to us to sustain his claim the case of The State of Kansas v. The Independence Gas Co. et al., 99 Kan. 671, and Arkansas & Memphis Ry., etc., Co., v. State ex rel., 174 Ark. 420. We have considered these cases and are of the opinion that the facts in each case are quite different from those in the instant case, in that while the companies leased all or most of their property to other companies, there was an express withholding of certain property and of their franchise and privileges, which they continued to exercise, and the respective courts found that each company was doing business of sufficient character and importance to bring the companies within the taxing acts.

*Conclusions of law*

1. The Delaware River Railroad & Bridge Company was not exercising the privilege of doing business, nor did it have property or capital employed in Pennsylvania during the year 1935 so as to bring it within the provisions of and subject it to the Corporate Net Income Tax Act of May 16, 1935, P. L. 208.

2. The appeal is sustained at the cost of the Commonwealth.

Judgment is directed to be entered in favor of defendant and against the Commonwealth, unless exceptions be filed within the time limited by law.