Johnstown, Appellant, *v.* Pennsylvania Public Utility Commission.

58

Argued April 9, 1957.   Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*M. H. Goldstein,* with him *Elvin Teitelbaum,* City Solicitor, for City of Johnstown, appellant.

*Edward Munce,* Assistant Counsel, with him *Albert Luttrell,* Assistant Counsel, and *Thomas M. Kerrigan,* Acting Counsel, for Public Utility Commission, appellee.

*Ernest R. vonStarck,* with him *Robert H. Young,* and *Morgan, Lewis & Bockius,* for Johnstown Water Company, intervening appellee.

OPINION BY RHODES, P. J., June 11, 1957:

In this rate proceeding the Pennsylvania Public Utility Commission has approved a proposed rate in-

crease for the Johnstown Water Company, intervening appellee, without making a specific determination of the fair value of the utility's property and without making a specific finding of a fair rate of return. The City of Johnstown has appealed, and questions the action of the commission.

The Johnstown Water Company was incorporated in 1866 and is a wholly owned subsidiary of the Bethlehem Steel Company. It provides water service, including fire protection, to domestic, commercial, industrial, and municipal customers in the City of Johnstown and in the boroughs and townships in the vicinity thereof. On February 25, 1954, the utility filed a supplement to its tariff providing for an increase of 20 per cent in all rates except fire protection service. The proposed rates became effective on May 1, 1954, by operation of law. The City of Johnstown had filed a protest on April 5, 1954. The rates had previously been increased by 33 1/3 per cent on February 1, 1953. Prior to the increase of 1953, the last general rate increase for this utility was in 1926. This was followed by a decrease in charges for public and private fire protection service in 1928.

The proposed rates were estimated to increase annual revenues by $197,240, or by 19.05 per cent more than that produced by the existing rates at the level of operations of December 31, 1953. The purpose of the increase, according to the utility, was "To offset the increased cost of operations . . . [and] To provide an operating income in an amount more nearly approaching a fair return on the minimum fair value of the company's property."

The utility, in presenting its case before the examiner, proceeded on the theory that the proposed rates would not produce the maximum allowable return. At the opening of the hearing, counsel stated that the util-

ity would present evidence to establish a present value of its property of $19,500,000 and a fair value for rate purposes of $12,500,000; and that, as the return from the proposed rates would be only $465,000 or 3.6 per cent of this rate base, it would be unnecessary to submit evidence to substantiate the fairness of such return. The utility thereupon proceeded to introduce what it considered to be sufficient substantial evidence to support the rates. It submitted evidence of original cost, and reproduction cost at spot prices of December 31, 1953, and at average price levels of 1951-1953, and 1949-1953.[1] The commission determined that original cost depreciated was $6,500,000 ($6,479,100) which was substantially in accord with the evidence presented by the utility. But the evidence of reproduction cost was found to contain certain infirmities and limitations which the commission fully discussed. After taking these into consideration and subject thereto, the commission made the following reproduction cost estimates depreciated: At spot prices of December 31, 1953, $19,024,085; at average price level of 1951-1953, $17,970,661; at average price level of 1949-1953, $17,059,240. (These amounts do not include $47,000 in materials and supplies.) The commission declined, however, to make a definite finding of reproduction cost. Instead, the commission noted the infirmities and limitations in the evidence and stated: ". . . the upward trend in prices during the past 15 years, together with the evidence of record, justify a conclusion that the depreciated reproduction cost of respondent's property at average prices of the five-year period (1949-1953)

---

[1] The measures of value after deduction for accrued depreciation as submitted by the utility were: Original cost, $6,478,429; reproduction cost at spot prices of December 31, 1953, $19,555,814, at price level of 1951-1953, $18,486,828, at price level of 1949-1953, $17,550,405.

would be not less than $13 million." The commission thus established a minimum reproduction cost for the purposes of this proceeding. No finding of fair value was made. The commission, after determining operating expenses, annual depreciation, income taxes, and operating revenues, found that the income available for return would be $446,412. The commission thereupon concluded its order as follows: "Capitalizing this $446,412 available for return at six per cent indicates a rate base of $7,450,000 (rounded) required to support respondent's proposed rates. This indicated rate base cannot be said to be in excess of any fair value we would be justified in making when consideration is given to our comments on measures of value; . . ."

In view of the utility's approach and the commission's methods, it is not surprising that the City of Johnstown questions the rate increase in the absence of additional evidence and specific findings of fair value and fair rate of return.

However, we have carefully examined the record and the commission's order with its findings, and as a consequence we have been obliged to conclude that this case is within the class of those cases which we have previously held to be of such a nature as to require no specific finding of fair value or of fair rate of return. It appears that the commission had sufficient evidence before it, although defective in certain respects which the commission noted and evaluated, to reach a conclusion that the proposed rates were just and reasonable and that the fair value of the utility's property would be in excess of any amount necessary to support the rates.

The purpose of a rate proceeding is to determine whether the rates, proposed or existing, conform to the statutory mandate that they be just and reasonable.

Public Utility Law of May 28, 1937, P. L. 1053, §301, as amended, 66 PS §1141. Where the rate proceeding is the result of a voluntary change in rates (Public Utility Law, §308, 66 PS §1148) to which a complaint is filed or the result of an investigation ordered by the commission on its own motion, the utility is required to substantiate the proposed rates. Public Utility Law, §312, 66 PS §1152; *Berner v. Pennsylvania Public Utility Commission,* 382 Pa. 622, 625, 116 A. 2d 738. The evidence which is produced in furtherance of this burden must be of sufficient quantity and quality to enable the commission to properly make its findings and reach its conclusions based thereon; the evidence must be substantial. There is no precise formula which the commission may apply to every case (*Orlosky v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 409, 415, 89 A. 2d 903), but it is required to use some reasonably scientific method in its determination. *New Street Bridge Company v. Public Service Commission,* 271 Pa. 19, 38, 114 A. 378. The findings which are made must be definite, consistent, detailed, and supported by the substantial evidence; they must be sufficient to enable this Court to review the commission's action and determine the questions raised on appeal. *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 71, 112 A. 2d 826; *Scranton-Spring Brook Water Service Company v. Public Service Commission,* 119 Pa. Superior Ct. 117, 123, 181 A. 77. Findings in a rate case are required to be more detailed and more specific than in other utility proceedings. See *Lancaster Transportation Company v. Pennsylvania Public Utility Commission,* 181 Pa. Superior Ct. 129, 141, 124 A. 2d 380.

In view of these basic principles, the question arises as to when it is necessary that a specific determination of fair value and of a fair rate of return be made. When

the commission imposes rates upon a utility or determines that the existing or proposed rates are unreasonable or in violation of the law, it is essential that a finding of fair value be made. *Perkasie Sewer Company v. Pennsylvania Public Utility Commission,* 142 Pa. Superior Ct. 262, 265, 266, 16 A. 2d 158; *Philadelphia v. Pennsylvania Public Utility Commission,* 162 Pa. Superior Ct. 425, 430, 57 A. 2d 613. However, where the rates are found to be just and reasonable, the commission may refrain from making specific findings of fair value and fair rate of return if the evidence before it is sufficient to enable it to reach that conclusion without making such specific findings, and if the evidence also indicates that the fair value would be in excess of any amount necessary to support the rates. *Philadelphia v. Pennsylvania Public Utility Commission,* supra, 162 Pa. Superior Ct. 425, 430, 57 A. 2d 613; *Philadelphia v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 96, 106, 63 A. 2d 391; *Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 104, 78 A. 2d 35; *Pittsburgh v. Pennsylvania Public Utility Commission,* 172 Pa. Superior Ct. 230, 233, 93 A. 2d 715; *Wall v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 35, 41, 125 A. 2d 630. The method has been used in a water utility rate proceeding. *Orlosky v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 409, 415, 89 A. 2d 903.

But it is not every case in which the rates are found to be just and reasonable that the commission may refrain from definitely establishing fair value and fair rate of return. It is only where the evidence is sufficient to enable the commission to reach that conclusion without making such findings that they may be left unspecified. A logical test is whether the evidence shows the return to be "obviously reasonable"; if so, the

findings are not essential.[2] *Philadelphia v. Pennsylvania Public Utility Commission,* 173 Pa. Superior Ct. 38, 50, 95 A. 2d 244. Regardless of any standard, no single rate of return is applicable to all utilities. See *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 386, 126 A. 2d 777. According to the utility's view of the evidence which it presented, the rate of return would have been 3.6 per cent. This would seem to be a reasonable return for this company under the circumstances as they appear in the record. The test is not whether the utility's view of the evidence indicates that the return is obviously reasonable, but whether it is obviously reasonable as the commission has finally determined the matter. The commission weighed the utility's evidence and found an original cost depreciated of $6,500,000 and a minimum reproduction cost depreciated of $13,000,000. The amount available for return was found to be $446,412. If such original cost alone is considered fair value, as the City contends it should be, the return would be 6.87 per cent, which may or may not be reasonable; it is not an obviously reasonable return. Substantial evidence of the fairness of such rate of return would be required. The record indicates that the fair value of the property of this utility is greater than $6,500,000 original cost depreciated, and that it is between that amount and the $13,000,000 minimum reproduction cost depreciated. The allowed return on these findings would be 6.87 per cent on $6,500,000 and 3.4 per cent on $13,000,000. The latter rate of return would

[2] The amount of the return is not alone determinative. For example, the return in *Orlosky v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 409, 413, 89 A. 2d 903, was $2,072; in *Philadelphia v. Pennsylvania Public Utility Commission,* 162 Pa. Superior Ct. 425, 431, 57 A. 2d 613, it was $4,238,000.

See, also, section 311 of Public Utility Law, 66 PS §1151.

be obviously reasonable; the same could not be said of the other. Between the two extremes there could be rates of return which would be reasonable, depending upon fair value approximating the $13,000,000 as minimum reproduction cost depreciated. Of course, there is no specific dividing point. We observe, without approving any formula, that the commission has been inclined to establish a definite finding of fair value, when one is made, at a point near the average of original cost depreciated and a reproduction cost depreciated. See *Orlosky v. Pennsylvania Public Utility Commission*, supra, 171 Pa. Superior Ct. 409, 413, 89 A. 2d 903; *Pittsburgh v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 363, 366, 101 A. 2d 761. In this case the average of those measures of value is approximately $9,750,000. A return of $446,412 would be a rate of return of approximately 4.6 per cent if $9,750,-000 were the finding of fair value.[3] This rate may still be within the range of those which would be obviously reasonable for this company. It cannot be said that it is unreasonable under the facts as they appear in this record. It should be noted that for reasons given the reproduction cost figure used in the calculations of the commission was much less than any such measure submitted by the utility. The commission pointed out that, if a 4.6 per cent return is tested against rates of return recently allowed as reasonable for water companies, it is shown to be more than a whole percentage point, approximately 20 per cent, lower. In *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 174 Pa. Superior Ct. 363, 367, 101

---

[3] In *Orlosky v. Pennsylvania Public Utility Commission*, 171 Pa. Superior Ct. 409, 413, 89 A. 2d 903, where this procedure was followed the return came to 6.5 per cent of original cost depreciated, 3.8 per cent of reproduction cost depreciated, and 4.8 per cent of the average.

A. 2d 761, involving the South Pittsburgh Water Company, a rate of return of 5.81 was found to be reasonable; in *Citizens Water Company v. Pennsylvania Public Utility Commission,* 181 Pa. Superior Ct. 301, 306, 124 A. 2d 123, a return at the rate of 5.7 per cent was allowed as reasonable. The Johnstown Water Company apparently is larger than the Citizens Water Company but smaller than the South Pittsburgh Water Company.[4] Naturally a rate of return which is reasonable for one utility may not be reasonable for another; the fact that the indicated rate here is approximately 20 per cent lower than others is some verification of its obvious reasonableness. See *Pittsburgh v. Pensylvania Public Utility Commission,* 174 Pa. Superior Ct. 4, 9, 98 A. 2d 249.

The City refers to our recent decisions involving Manufacturers Light and Heat Company (*Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 178 Pa. Superior Ct. 46, 71, 112 A. 2d 826; *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 126 A. 2d 777; *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 551, 564, 128 A. 2d 372) where we held that the commission could not make a judgment allowance in establishing the rate of return without support in the record. In those cases the reasonableness of the rates was in doubt, and the commission made specific findings of fair value and fair rate of return as it was required to do. Its finding on rate of return, however, exceeded any evidentiary support in the record. Here the commission did not undertake to make such specific findings. It did determine the possible range of value from the evidence and concluded that the re-

---

[4] The finding of fair value of the South Pittsburgh Water Company was $21,000,000; the finding of fair value of the Citizens Water Company was $6,750,000.

turn allowed, when capitalized at any reasonable rate, would produce a value less than the fair value of the utility's property. This was permissible under the circumstances. *Philadelphia v. Pennsylvania Public Utility Commission,* supra, 162 Pa. Superior Ct. 425, 430, 57 A. 2d 613; *Orlosky v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 409, 413, 89 A. 2d 903.

The use of a procedure such as this, in contrast to that in which specific findings of fair value and fair rate of return are made, does not condone or encourage a lesser degree of preparation on the part of the utility. It is essential that substantial evidence be produced to sustain the rates as just and reasonable. See *Philadelphia v. Pennsylvania Public Utility Commission,* 173 Pa. Superior Ct. 38, 50, 51, 95 A. 2d 244. In some cases, as here, the substantial evidence before the commission permitted it to act finally without specific findings of fair value and fair rate of return. On the other hand, evidence, although substantial, may indicate some doubt as to the reasonableness of the rates; under such circumstances specific findings of fair value and fair rate of return are required in order to establish that the proposed rates are just and reasonable or to establish what rates would be just and reasonable if the proposed rates are not. We wish to emphasize that some findings in a commission's order are necessary—as in the present proceeding where original cost and minimum reproduction cost were found—from which the commission can determine the reasonableness of the rates without more specific findings; and such findings, as we have said, must be sufficient to enable this Court to make a proper review on appeal. In other cases additional specific findings may be required. In all cases, however, there must be substantial evidence to support the findings and determina-

tions of the commission. See *Pittsburgh & Lake Erie Railroad Co. v. Pennsylvania Public Utility Commission,* 170 Pa. Superior Ct. 411, 416, 85 A. 2d 646; *Modern Transfer Company v. Pennsylvania Public Utility Commission,* 179 Pa. Superior Ct. 46, 52, 53, 115 A. 2d 887.

The City contends that since the commission found certain infirmities and limitations in the utility's reproduction cost estimates it erred in making any finding of reproduction cost. The City would accept the finding of original cost as the only evidence of fair value; on that basis the rate of return of 6.87 per cent would not be obviously reasonable. Part of the reproduction cost evidence submitted by the utility was admittedly unorthodox with respect to the manner in which it was prepared. Ordinarily reproduction cost is based upon spot prices at the cut-off date and at the average price levels for periods of several years, usually three, five, and ten years, prior thereto. See *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 174 Pa. Superior Ct. 4, 9, 98 A. 2d 249. The utility in the present proceeding used in part a trended reproduction cost method.[5] The utility began with an inventory it had made in 1937, adjusted it for retirements and transfers since that time, and trended the 1937 cost to the December 31, 1953, spot price level. The original cost of additions from 1938 to 1953 was likewise trended to December 31, 1953, spot price level. The 1953 spot prices were then trended to the three and five year average price levels. Land was included in all estimates at original cost. The commission ana-

---

[5] Trended original cost has been used in estimating reproduction cost. *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 53, 112 A. 2d 826; *Duquesne Light Company v. Pennsylvania Public Utility Commission,* 176 Pa. Superior Ct. 568, 579, 107 A. 2d 745.

lyzed the evidence concerning the 1937 inventory and decided: ". . . the 1937 inventory and appraisal will be accepted as the starting point to determine measures of value based on 'reproduction cost' in the instant proceeding." [6] The commission also scrutinized the cost indices and trending methods used. It took account of any inherent weaknesses in estimating reproduction costs, and said that a reproduction cost estimate based on some previous price level properly trended to present-day price levels was the mathematical equivalent of a reproduction estimate made de novo at present-day prices. The reproduction cost evidence submitted by the utility was adjusted subject to the limitations, and the commission concluded that although it was unable to make definite findings of reproduction cost the evidence was such as to allow it to find that the minimum reproduction cost depreciated would be not less than $13,000,000. The processes used by the commission in analyzing and evaluating the evidence to arrive at this finding seem clear from its order. See *Scranton-Spring Brook Water Service Company v. Public Service Commission,* supra, 119 Pa. Superior Ct. 117, 123, 181 A. 77. The City argues that it was inconsistent for the commission to make a minimum finding of reproduction cost in view of its statement that it could not make a definite finding of reproduction cost. Considering the order in its entirety, it appears that the commission noted certain defects in the evidence which required adjustment; that these defects could not be

---

[6] The commission also states:

"The basis upon which the 1937 inventory was prepared, as hereinbefore recited, leads to the conclusion that the inventory is reasonably all-inclusive of respondent's plant. Likewise, the basis upon which unit prices were determined, as hereinbefore recited, leads to the conclusion that respondent's estimates are reasonably inclusive of all elements of cost."

accurately adjusted; that notwithstanding the limitations the evidence established a minimum reproduction cost depreciated of $13,000,000; and that any higher amount could not be ascertained with certainty. The method is unusual, although not erroneous under the circumstances as it was found to result in a reasonably accurate minimum figure which could be used to determine whether the rates were just and reasonable. *New Street Bridge Co. v. Public Service Commission,* supra, 271 Pa. 19, 38, 114 A. 378. "Essentially, it would appear that the question involved here is one of the weight to be given the trended cost evidence. Such evidence is merely a guide in the determination of fair value. It cannot be seriously contended that even under the best of conditions it is free from error, and the fact that it does contain defects would not justify the Commission in rejecting it. So long as the evidence is reasonably accurate, the weight to be given it is a matter for the Commission: . . ." *Duquesne Light Company v. Pennsylvania Public Utility Commission,* supra, 176 Pa. Superior Ct. 568, 580, 107 A. 2d 745, 750. In some instances the commission may find the evidence to be of little or no persuasive effect. For example, in *Citizens Water Company v. Pennsylvania Public Utility Commission,* supra, 181 Pa. Superior Ct. 301, 311, 312, 124 A. 2d 123, the commission, after giving consideration to the opinion evidence of present value of the utility's land, rejected it as "wholly unsatisfactory and unreliable as a measure of value," leaving original cost as the only acceptable measure of fair value. Although the commission found defects therein, here the evidence of reproduction cost was of sufficient reliability for the commission to use it in the limited manner in which it did. "After giving consideration to any relevant facts, it is within the province of the commission to determine the weight to be given the evidence,

the reliability of the estimates and the opinions, and the credibility of the witnesses. Unless there is a lack of support for it in the evidence or it is the result of an abuse of discretion or of capricious action, the commission's resolution of these matters will not be disturbed." *Citizens Water Company v. Pennsylvania Public Utility Commission,* supra, 181 Pa. Superior Ct. 301, 307, 124 A. 2d 123, 126.

The City condemns the method used by the commission in arriving at accrued depreciation. The utility submitted an estimate of accrued depreciation based upon the 4 per cent compound interest method; it also presented its book reserve for depreciation. The 4 per cent compound interest method produced a factor of 8.15 per cent which the utility applied to the original cost and the three measures of reproduction cost of both depreciable and nondepreciable property. The commission in its order held that the utility erred in using the average age and average life of property in estimating the accrued depreciation by the 4 per cent compound interest method, and that it resulted in an understatement of the accrued depreciation. Accordingly, the commission increased the amount of accrued depreciation by applying judgment figures, based upon the evidence submitted, of 9 per cent to the original cost and 10 per cent to the reproduction cost estimates of depreciable plant. We approved such an adjustment with respect to accrued depreciation in *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 174 Pa. Superior Ct. 363, 367-370, 101 A. 2d 761. We there stated (pages 370, 371 of 174 Pa. Superior Ct., page 765 of 101 A. 2d) : "The determination of accrued depreciation by the Commission is essentially a matter of judgment. . . . In the present case the Commission properly considered the results of the application of the compound interest method as guides merely, rather

than as absolute measures of accrued depreciation. . . . The Commission's findings of accrued depreciation applicable to original cost and to reproduction costs were judgment figures which were higher in each instance than as computed by the strict application of the compound interest formula." The City contends that the book reserve for depreciation should have been used. This was higher than the 4 per cent compound interest figure submitted by the utility and higher than the judgment figure reached by the commission. The commission found the book reserve unreliable, giving as a reason that it was computed at the shortest possible life allowable by the Internal Revenue Service for income tax purposes. Recently, in *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 178 Pa. Superior Ct. 46, 57, 112 A. 2d 826, 831, in commenting upon a similar contention, we said: ". . . the commission, within the sphere of its authority, could have accepted the utility's book reserve if convinced of its reliability and accuracy. The commission is not bound to accept any particular method in estimating accrued depreciation and depletion which are essentially judgment figures, and if based on substantial evidence are binding on appellate review. . . . But in so determining accrued depreciation and depletion the book reserve is by no means conclusive and may be inaccurate. . . . The fact that the book reserve showed a higher or lower amount than the reserve requirement study has no effect on the principles applicable to such administrative finding."

The City's remaining contention is that the commission actually fixed a rate of return of 6 per cent, and that this is unwarranted and unsupported by any evidence. The obvious answer to this is that the commission made no specific finding of rate of return. It determined the minimum range of value. It capitalized

the amount available for return at 6 per cent and the result was well within the range. The commission could have capitalized the return at a lesser percentage to illustrate its reasonableness. As we have previously indicated, the return, capitalized at 4.6 per cent, would have resulted in an indicated rate base of $9,750,000, the mathematical average of original cost depreciated and the minimum reproduction cost depreciated.

The manner in which the difficulties arose in this case is quite obvious. The utility apparently felt that under its evidence of value the rate increase was clearly within the realm of reasonableness. At the very beginning of its case it indicated its intention to refrain from introducing evidence of fair rate of return because the reasonableness of the rates seemed to it to be so obvious. But the commission, although it ultimately agreed that the rates were just and reasonable, nevertheless properly recognized the infirmities and defects existing in the evidence of value. While the rates were found to be just and reasonable regardless of these infirmities and defects, the latter had the effect of detracting from the utility's original impression of the evidence and certainly strengthened to some degree the contentions of the City. Our review, however, has indicated that the commission did not err in concluding from the adjusted and modified measures of value that the rates under the proposed supplemental tariff were lawful under any reasonable minimum finding of fair value.

We think it is incumbent upon us to refer to the fact that this is the second rate increase for this utility within the period of a year. Although it is only the third increase since 1926, we cannot fail to observe that the 1926 rates, which the utility apparently felt produced a fair return until the increase was sought in 1953, have been increased approximately 60

per cent by these two proceedings. The propriety of instituting several proceedings for rate purposes within a relatively short period of time, each involving a substantial percentage increase in the rates charged for service, is questionable. Rates are established to operate in the future; they should be permitted to remain in effect for a reasonable period unless an unforeseen or extraordinary condition arises which warrants a new increase. Moreover, consumers may be required to bear the costs of the utility in a rate case. See *Pittsburgh v. Pennsylvania Public Utility Commission*, 169 Pa. Superior Ct. 400, 404, 82 A. 2d 515. Frequent proceedings, instituted merely because opinion testimony may indicate some increase in the value of a utility's property or because there may be some fluctuation in operating costs, certainly are not compatible with the public interest. See *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 182 Pa. Superior Ct. 551, 554, 555, 128 A. 2d 372.

The order of the commission is affirmed.