Riverton Consolidated Water Company, Appellant, *v.* Pennsylvania Public Utility Commission.

2

3

Argued October 3, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Ernest R. von Starck* and *Robert H. Young*, with them *Morgan, Lewis & Bockius*, for water company, appellant.

*Arthur H. Fribourg*, with him *Melvin Richter*, Attorneys, Department of Justice, *Harold K. Wood*, United States Attorney, *Geo. S. Leonard*, Acting Assistant Attorney General, *Henry P. Sullivan*, Assistant United States Attorney, and *Lawrence E. Masoner*, Attorney, Department of the Army, for United States, appellant.

*Edward Munce*, Assistant Counsel, with him *Thomas M. Kerrigan*, Acting Counsel, for Pennsylvania Public Utility Commission, appellee.

OPINION BY RHODES, P. J., March 24, 1958:

The Riverton Consolidated Water Company and the United States of America (Departments of the Army and the Navy) appeal from an order of the Pennsylvania Public Utility Commission prescribing rates for water service. Riverton supplies water to army and navy installations.

Riverton is a wholly owned subsidiary of Northeastern Water Company. It renders service in an area encompassing portions of Cumberland and York Counties, and provides water for the New Cumberland General Depot of the Department of the Army and for the Mechanicsburg Naval Supply Depot of the Department of the Navy. Riverton was incorporated on February 17, 1904, and by merger acquired several operating water companies and water company franchises. It subsequently acquired franchises and assets from other water companies in the area.

On September 14, 1955, Riverton filed Supplement No. 5 to Tariff Water—Pa. P. U. C. No. 8, and Supplement No. 1 to Tariff Water—Pa. P. U. C. No. 7, to become effective November 15, 1955. Tariff No. 8 covers service provided to 10,522 customers. Supplement No. 5 thereto proposed an increase of 25 per cent in the metered rates and in the charges for private fire protection. No change was proposed for public fire protection. Based on the level of operations of June 30, 1955, the proposed increase was estimated by Riverton to amount to $81,279.

Tariff No. 7 applies only to service provided for the Mechanicsburg Naval Supply Depot. Supplement No. 1 thereto proposed a rate schedule identical with that proposed in supplement No. 5 to tariff No. 8, and would have increased the revenues from this one customer by approximately $641, or 11.14 per cent.

The total increase of $81,920 proposed by both supplements would have been a composite increase in annual charges of 23.92 per cent of the operating revenues of $342,470 under the existing rates at the level of operations at June 30, 1955.

On November 14, 1955, the commission suspended the operation of the supplements for a period of six months and concurrently ordered an investigation on

its own motion for the purpose of determining the fairness, reasonableness, justness and lawfulness of the proposed rates, charges, rules, and regulations, the investigation to include consideration of the lawfulness of existing rates, rules, and regulations, and of the imposition of temporary rates. On April 30, 1956, the operation of the proposed supplements was further suspended until August 15, 1956. Six complaints were filed, one of which was filed by the United States. All the complaints were consolidated with the commission's investigation for the purpose of hearing. Hearings were held on six occasions from January 5, 1956, to June 4, 1956. Briefs were filed but no oral argument was had. On August 7, 1956, the commission filed its order in which it sustained, to a certain extent, three of the complaints not involved in these appeals, and in which it ordered the cancellation of tariffs Nos. 7 and 8 and all supplements thereto and their replacement by tariffs Nos. 9 and 10, respectively, containing the rates prescribed by the commission. The commission found that the existing rates at June 30, 1955, were producing $344,470 annual operating revenues; that the proposed rates would have produced $426,390; and that the prescribed rates would produce allowable operating revenues of $382,301.

Riverton questions only the commission's finding that a consolidated tax saving of 45 per cent should be applied in determining the allowance for federal income taxes.

The United States has appealed on behalf of the Departments of the Army and the Navy, and has set forth numerous complaints to the action of the commission in general and as it relates to their respective installations.

*Fair Value.* The last preceding rate increase for Riverton became effective early in 1951. Riverton in-

dicated that thereafter it had undergone a substantial growth in territory which necessitated major expenditures for improvements and additions to its plant to the extent of $1,675,000. It had retirements of only $38,760; the prior original cost of its plant was $1,346,405. The proposed increases were sought to provide a return on the recent substantial additions to its plant, and to provide an operating income commensurate with a fair return. In its proofs Riverton submitted five measures of value of its plant as of June 30, 1955, based on (1) book cost, (2) original cost, (3) reproduction cost estimates at spot prices of December 31, 1954, at the average price level of the three years 1952-1954, and at the average price level of the five years 1950-1954.[1] The commission gave no consideration to the submitted book cost in arriving at a fair value of the property of Riverton. Adjustments were made to the original cost and reproduction cost estimates by eliminating certain equipment found not to be used and useful in the public service and by deducting unrefunded portions of customers' advances for construction. Construction work in progress of approximately $60,000 was also deducted. After deducting accrued depreciation based on the 4 per cent compound interest method and adding $56,800 for materials and supplies, the commission arrived at the following measures of value: Original cost $2,146,585; re-

---

[1] The depreciated values submitted by Riverton were as follows:

Book cost $2,833,357; original cost $2,712,079; reproduction cost at spot prices of December 31, 1954, $4,369,821; reproduction cost at the average price level of the three years 1952-1954, $4,197,905; reproduction cost at the average price level of the five years 1950-1954, $4,009,587. These measures of value exclude contributions in aid of construction and include $56,800 in materials and supplies.

production cost at spot prices of December 31, 1954, $3,403,270; reproduction cost at the average price level of 1952-1954, $3,269,440; and reproduction cost at the average price level of 1950-1954, $3,125,272. The fair value of Riverton's property used and useful in the public service was then determined by the commission to be $2,700,000 at June 30, 1955.

It is contended by the United States that at this stage of the proceeding the commission erred in accepting the unit costs at the spot prices of December 31, 1954, and in accepting the trending procedures used in transposing the spot price estimates to the three-year and five-year average price levels; in accepting the 4 per cent compound interest method to ascertain accrued depreciation; and in determining the fair value of Riverton's property to be $2,700,000. The United States would have the original cost depreciated accepted as fair value.

The commission found that the unit costs at spot prices of December 31, 1954, and the trending methods used "do not appear unreasonable." The United States contends that a more positive finding should have been made. Before arriving at this finding the commission discussed the unit costs and trending methods, noting that the unit costs were computed from prices obtained from local suppliers where possible, and otherwise from manufacturers; that special discounts were considered; that labor costs were based on local union labor rates; that the indices used for trending were either published indices or indices developed for items of property from quotations of manufacturers or suppliers. The record indicates the method by which some of the indices were developed. The reproduction cost estimates were based on a complete inventory and appraisal of Riverton's property prepared by an engineering firm qualified to do this work. An

expert from the firm testified in detail as to the recognized methods of trending used. The order of the commission indicates that the commission gave adequate consideration to the reproduction cost evidence which it found to be reliable. "There was substantial evidence of reproduction cost based upon pricing methods used by the company's expert. The validity of the method used and the weight of the testimony on this phase of the case were for the Commission and not for us." *Pittsburgh v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 363, 373, 101 A. 2d 761, 766.

The use of the 4 per cent compound interest method was likewise a matter for the consideration of the commission in determining the actual depreciation of the property at the cut-off date. The commission fully considered the evidence submitted by Riverton, which consisted of book depreciation and depreciation based on the 4 per cent compound interest method. It found that book depreciation was defective and rejected it. Adjustments were made to the depreciation computed by the 4 per cent compound interest method and the adjusted figure was accepted. We find no error in the method or the conclusion which would require reversal. See *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 174 Pa. Superior Ct. 363, 367-371, 101 A. 2d 761; *Johnstown v. Pennsylvania Public Utility Commission*, 184 Pa. Superior Ct. 56, 72, 133 A. 2d 246.

The commission allowed $56,800 for materials and supplies. This was computed by rounding the five-year average of the balances in this account. The United States contends it was error to allow this sum because a witness for Riverton testified that some of the materials and supplies could be used for construction work as well as for maintenance. The witness did

not state the respective amounts because both future repairs and future construction could not be precisely determined. Riverton was entitled to a reasonable allowance in its rate base for materials and supplies on hand to meet normal repair requirements. Matters of this nature depend largely upon the judgment of the commission properly exercised on the evidence submitted. See *Wall v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 35, 50, 51, 125 A. 2d 630. The amount allowed was less than the amount actually on hand at the cut-off date; it was an average of that account for the preceding five years which supports its validity.

The commission's finding of a fair value of $2,700,-000 is within the evidence submitted and the commission's determination of the respective measures of value derived therefrom. The fact that much of Riverton's plant is of recent origin would not prevent the commission from considering the reproduction cost evidence in addition to the original cost so long as the reproduction cost evidence was reasonably accurate and reliable as proof thereof. As we have said, a utility is entitled to a fair return on the fair value of its property used and useful in the public service at the time the rates are established or at the time the value is in issue, which is usually the cut-off date. *Citizens Water Company v. Pennsylvania Public Utility Commission*, 181 Pa. Superior Ct. 301, 306, 124 A. 2d 123. The commission in arriving at fair value may consider a number of measures of value as well as the original cost; the commission is not bound by any particular formula; and fair value is not necessarily synonymous with original cost or with any other single measure of value. See *Citizens Water Company v. Pennsylvania Public Utility Commission*, supra, 181 Pa. Superior Ct. 301, 306, 307, 312, 124 A. 2d 123.

The weight to be given to the established measures of value was a matter for the commission if its discretionary power was not capriciously exercised. Ordinarily, a finding of fair value should not be merely a mathematical average, but should display an exercise of well-founded judgment. In the absence of an error of law, an abuse of discretion, or any indication of caprice, we shall not disturb the finding of fair value. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 174 Pa. Superior Ct. 363, 373, 101 A. 2d 761; *Citizens Water Company v. Pennsylvania Public Utility Commission,* supra, 181 Pa. Superior Ct. 301, 307, 124 A. 2d 123; *Johnstown v. Pennsylvania Public Utility Commission,* supra, 184 Pa. Superior Ct. 56, 71, 133 A. 2d 246.

*Rate of Return.* Before the commission Riverton claimed a rate of return of 6.75 per cent based on a claimed cost of capital of 6.50 per cent and an allowance for other factors. To substantiate the cost of capital, Riverton submitted evidence of two capital structures and the respective costs as follows:

| Structure A | Capital Structure | Cost Rate | Composite Cost |
|---|---|---|---|
| Long Term Debt ...... | 55% | 4.00% | 2.20% |
| Common Stock & Surplus | 45 | 10.50 | 4.72 |
| Total ............. | 100% | | 6.92% |
| *Structure B* | | | |
| Long Term Debt ...... | 55% | 4.00% | 2.20% |
| Preferred Stock ........ | 10 | 4.90 | .49 |
| Common Stock & Surplus | 35 | 11.00 | 3.85 |
| Total ............. | 100% | | 6.54% |

The evidence in support of these claims was presented on behalf of Riverton by a financial analyst and investment advisor. The actual capital structure of Riverton, exclusive of short term notes and unsecured advances, for the years 1947-1950 was an average of 39.7 per cent debt and 60.3 common equity; for the years 1951-1954, it had an average of 69.7 per cent debt and 30.3 per cent common equity. As of June 30, 1955, Riverton was capitalized at 66.5 per cent debt and 33.5 per cent common equity. The commission considered and analyzed the evidence submitted by Riverton in support of a reasonable capital structure as against the actual unbalanced capital structure, and concluded that the cost of capital to be used in determining a fair rate of return should be as follows:

| Type of Capital | Capital Structure (per cent) | Cost Rate (per cent) | Composite Cost (per cent) |
|---|---|---|---|
| Bonds ............ | 60 | 3.90 | 2.34 |
| Preferred Stock .... | 10 | 4.90 | .49 |
| Common Equity ... | 30 | 9.50 | 2.85 |
| Total ......... | 100 | | 5.68 |

To the finding of a composite cost of capital of 5.68 per cent the commission allowed an additional .12 per cent for market fluctuations. It thus arrived at a rate of return of 5.80 per cent, which it applied to the fair value finding of $2,700,000 for an allowable return of $156,600.

The United States contends that the commission erred in using a "hypothetical" capital structure and in applying thereto an "assumed" cost of capital rather than accepting the historical cost of capital as applied to the existing capital structure. It is also asserted that the commission erred in making an allowance

above the cost of capital in determining the fair rate of return.

*Capital Structure.* The United States argues, in effect, that the existing capital structure of Riverton, being predominantly debt capital, should have been accepted since it would result in a lower composite cost of capital. In this respect, it is said that the allowance of a rate of return computed on a higher percentage of equity capital (which is more costly than debt capital) than actually exists in the capital structure of this utility would result in higher charges to the ratepayers; and that as a matter of fact no cost is incurred or likely to be incurred in the reasonably foreseeable future which would warrant the use of other than the actual capital structure. The slight variation between the actual capital structure of Riverton and the capital structure accepted by the commission in determining a composite cost of capital, which in turn was used as a guide in fixing the rate of return, would be material if a rate proceeding were simply to determine the characteristics of a utility at the cut-off date without regard for future operation and without considering whether the use of such actualities is fair and reasonable to both the utility and the consumer. See *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 392, 126 A. 2d 777. The rate of return allowed to a utility must be fair. The commission may give consideration to a number of factors, if substantiated by the evidence, in determining a fair rate of return. An acceptable consideration in arriving at a basis for determining a fair rate of return is known as "cost of capital," that is, a percentage figure of the cost a utility would be obliged to pay to obtain debt and equity capital. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 384, 126 A. 2d 777. Cost of capi-

tal, when properly determined, indicates that the commission has given consideration to the financial structure of the utility, credit standing, dividends, interest, attendant risks, regulatory lag, wasting assets, and any peculiar features of the utility involved. A fair rate of return is not always synonymous with the cost of capital, but usually cost of capital is one of the most important bases upon which a fair rate of return is found.

In order to arrive at a cost of capital, the commission naturally determines a capital structure to which the respective costs of debt and equity capital may be applied in proper proportions. Where, as here, the utility is a wholly owned subsidiary, its capital structure may not be one which it would maintain if it were obliged to obtain its debt and equity financing on the open market rather than from a parent company. In such instances the actual capital structure may be weighted too heavily on the debt side or on the equity side. Riverton is such an example. From 1947 to 1950 it had a capital structure averaging 39.7 per cent debt and 60.3 per cent common equity, but from 1951 to 1954 the average structure was 69.7 per cent debt and 30.3 per cent common equity. The use of the actual capital structure in such peculiar circumstances might be unfair to either the utility or its customers, depending upon whether debt or equity is disproportionately high. Under such circumstances the commission must make adjustments based upon substantial evidence in order to reach a fair result. In *The Manufacturers Light and Heat Company* cases (*Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 381, 126 A. 2d 777; *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 564, 582, 128 A. 2d 372), we approved the action of the commission in applying the

cost of capital of the parent company to the subsidiary utility under conditions similar to the present. In the instant proceeding, the commission considered the cost of capital of the parent company and found that the parent itself did not have a representative capital structure, and therefore restricted the weight which the cost of capital of the parent would have in this rate proceeding. The commission then turned to the other evidence of a reasonable capital structure submitted by Riverton and arrived at the structure indicated which it found fair to all concerned. The action of the commission in this respect was based on the evidence submitted and in fact closely approximates the actual capital structure of Riverton on June 30, 1955. The capital structure used by the commission was similar to those of comparable water companies. See *Wall v. Pennsylvania Public Utility Commission*, supra, 182 Pa. Superior Ct. 35, 45, 125 A. 2d 630; *Johnstown v. Pennsylvania Public Utility Commission*, supra, 184 Pa. Superior Ct. 56, 66, 67, 133 A. 2d 246. It is true that Riverton was not entitled to have the cost of capital computed on an "ideal" capital structure (*Pittsburgh v. Pennsylvania Public Utility Commission*, 171 Pa. Superior Ct. 187, 207, 90 A. 2d 607), but it was proper for the commission to adjust the existing capital structure to arrive at one which would be fair and reasonable to both the utility and the ratepayers in the computation of the cost of capital. In view of the great fluctuation in the capital structure of this utility, it was the duty of the commission to scrutinize the evidence carefully and to make adjustments which would bring the capital structure to be used for rate purposes in accord with one which was fair, reasonable, and stable. See *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 182 Pa. Superior Ct. 376, 383, 126 A. 2d 777.

*Cost of Capital.* The United States contends that the current costs of capital utilized by the commission in arriving at a composite cost of capital for Riverton lack evidentiary support; and further that the commission erred in failing to accept the historical cost of capital of Riverton, which is lower than the current cost of capital. The cost of capital which is to be determined in a rate proceeding is that existing at the time the rates are established or at the cut-off date; that is, the commission should determine the cost, based on evidence of the recent past if the same is reliable, to the utility to obtain debt and equity capital in the future. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 384, 126 A. 2d 777; *Citizens Water Company v. Pennsylvania Public Utility Commission,* supra, 181 Pa. Superior Ct. 301, 306, 124 A. 2d 123. The historical cost of capital to the utility may be considered by the commission, but it alone is not controlling.

The commission found that the reasonable current cost rate for debt capital, applicable to a 60 per cent debt ratio, was 3.90 per cent. This finding was based on evidence submitted by Riverton, which was considered, analyzed, and adjusted by the commission. Riverton claimed a current cost of debt capital of 4 per cent, assuming a 55 per cent debt ratio, based upon the cost of bond money experienced by 63 comparable water companies in 92 debt issues from 1951 to 1955. The commission requested additional evidence of individual bond issues, and this showed that the average cost of 21 issues in 1954 was 3.66 per cent, and that the average cost of 24 issues in 1955 was 3.89 per cent, 7 issues of which had an average cost of 3.92 per cent. The commission rejected the unusually high cost prevailing in 1953, and the fact that the parent company had outstanding collateral bonds at a cost of 5.51 per cent.

The commission also found that the current cost rate of preferred stock was 4.90. This figure was derived largely in the same manner as the cost of debt capital. It was based on the commission's analysis of 28 preferred stock issues by 27 water utilities during the period 1951 to 1955. The abnormal cost (5.50) of preferred stock in 1953 was rejected, and the commission gave weight to the average costs for 1954 and 1955 which were 5.03 per cent and 4.97 per cent, respectively.

The commission further found 9.50 per cent to be the reasonable cost rate for common equity capital applicable to a 30 per cent common equity capitalization. Riverton claimed a common stock capital cost ranging from 10.50 per cent on a 45 per cent common equity capitalization to 11 per cent based upon a 35 per cent equity capitalization. The evidence submitted by Riverton in support of its contention consisted largely of the cost experience of other water utilities because none of the stock of Riverton or of Northeastern or of its other subsidiaries is traded on the open market. The commission rejected certain unrepresentative costs and arrived at the figure 9.50 per cent.

The findings of the commission as to the respective costs of capital, and its ultimate finding of a composite cost of capital of 5.68 per cent are within the scope of the evidence and will not be disturbed. The evidence as to the cost of capital submitted by the United States, especially concerning the earnings-common equity ratios as compared with the earnings-price ratios, was considered and rejected by the commission. The United States contended, without success, that a rate of return of 4.73 per cent would be reasonable, since it would provide the interest payments on Riverton's outstanding debts, long term and short term, and would also cover an equity cost rate of 11 per cent. The commission found certain defects in the evidence of the United

States, and further stated: "Earnings-equity ratios indicate the rate of return actually earned on equity capital originally invested, but are not a measure of the return required by investors today. Such a ratio does not meet our regulatory requirements of determining a current fair return upon today's fair value, and not upon original dollars invested. In our opinion, our use of representative current earnings-price ratios in finding a fair rate of return allows a return on the equity portion of the fair value at a typical current equity cost rate actually required by investors."

*Allowance Above the Cost of Capital.* As we have indicated, the commission made an allowance of .12 per cent above the cost of capital of 5.68 per cent in determining a fair rate of return of 5.80 per cent. The commission observed that the capital markets fluctuate constantly, and that its finding of fair rate of return was based on its "review of the capital costs indicated by the record, . . . [its] knowledge of the current security markets and the various elements comprising respondent's operations and organization." The reasons given for the allowance above the cost of capital in this proceeding are as unacceptable as in *The Manufacturers Light and Heat Company* cases (*Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 126 A. 2d 777; *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 128 A. 2d 372) where we held that such allowance was improper as it had no foundation in the evidence but was a double allowance for the same factors entering into the determination of the cost of capital. The allowance in this case is improper and is disallowed.

*Consolidated Tax Return Savings.* In determining the annual allowance for income taxes, the commission recognized that Riverton has an annual saving of 45

per cent in its tax liability resulting from a consolidated income tax return filed by Northeastern, the parent company. On this basis an annual allowance for federal income taxes in the amount of $14,496 was made; this was proper. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 580, 128 A. 2d 372. Riverton contends that it should have been allowed an amount equal to that which it pays to its parent company regardless of any lesser liability under the consolidated return actually filed by Northeastern.[2] Riverton calculated that the annual allowance for federal income taxes under its proposed rates should be $56,591.22. Its contention is without merit. The fact that Riverton actually pays to Northeastern an amount for taxes greater than its proper proportionate share of the consolidated tax liability merely accomplishes in fact that which it is forbidden to do. The making of an improper payment does not eliminate its impropriety. The only proper tax expense which Riverton may pass on to its customers is its proportionate share after the consolidated return is filed and the actual tax paid. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 581, 583, 128 A. 2d 372. Riverton contends that the saving under the consolidated return results from operations and transactions of Northeastern which are "totally unrelated to Riverton or the income from its investment in Riverton." Riverton, however, fails to recognize that the savings actually result from the use of the holding company system. We pointed out in *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 583, 128 A. 2d 372, 387, that: "The use of a con-

---

[2] Riverton apparently pays an amount for taxes to its parent company equal to that which it would pay if it were filing a separate return.

solidated tax return, the same as the use of the holding system of investment, is of mutual benefit to the . . . [parent] and its subsidiaries. Advantages which result from this system should benefit the consuming public as well as the utility and the parent company."

*The United States Naval Supply Depot.* In 1945 the United States Navy entered into a contract with Riverton to supply water to the Naval Supply Depot at Mechanicsburg. Under the contract it advanced to Riverton $123,000 for construction of about 12,500 feet of 12-inch main to serve the depot, and Riverton agreed to construct, retain title, operate, maintain, and carry the burden of all risks of loss or damage to the main. Riverton also agreed to refund to the Navy an amount equal to 25 per cent of each monthly billing for a term of 25 years from the date of the contract. As of June 30, 1955, there was a balance of $103,889 unrefunded.

The United States contends, and it offered testimony tending to establish, that at the end of the 25-year refund period there will remain unrefunded an amount of approximately $80,000. Apparently the reason that the Navy may not receive the full refund at the end of the 25-year period is the fact that since the end of World War II the use of water at the Naval Supply Depot at Mechanicsburg, upon which the 25 per cent monthly billing refund is based, is in a lesser quantity than originally contemplated. Under the Uniform System of Accounts for Water Utilities of the Pennsylvania Public Utility Commission, any unrefunded portion of the Navy's construction advance at the end of 25 years will be transferred to Account 615, Miscellaneous Water Revenues. The United States argues that the commission erred in refusing to extend the period of refund to cover the entire original construction advance, otherwise the utility will receive a

"windfall" of about $80,000 at the end of the 25-year period.[3]   It is questionable whether matters relating to the refunds under the original contract were properly before the commission since the United States did not include this matter in its complaint filed to the proposed rates; moreover, it might be that this is not a matter to be considered in a rate proceeding.  See Rule 26 of the Commission's Rules of Practice adopted May 2, 1944.   Apart from the procedural aspects, it appears that the determination of the amount which will be unrefunded at the end of the 25-year period is too remote to be determined at the present time.   The United States presented evidence that under present conditions $80,000 will be unrefunded by 1970.   This does not take into account any changes in the amount of water used by the Naval Supply Depot or in the rates paid therefor in the interim.   The remoteness of this future condition is sufficient basis for its exclusion from consideration in the proceeding at this time. See *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 564, 579, 128 A. 2d 372.   It is not necessary to decide whether the matter was properly raised in this proceeding or whether the commission had power under section 920 of the Public Utility Law, 66 PS §1360, to modify the original contract.   See *Reading & Southwestern Street Railway Co. v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 61, 63, 77 A. 2d 102; *Graham v. Philadelphia,* 334 Pa. 513, 528, 6 A. 2d 78.

The second contention of the United States concerning the Naval Supply Depot relates to the failure of the commission to award reparations of $17,904. The

[3] The commission has excluded from Riverton's rate base all unrefunded customer advances in aid of construction and has increased its operating revenues by an average amount for advances which it estimated will be forfeited each year.

rates for water service provided to the Naval Supply Depot were established by the agreement between Riverton and the Navy in 1945. The agreement was filed with the commission, effective August 24, 1945, as tariff No. 7. It was contended before the commission that the amount paid under the contract up to December 31, 1950, was approximately 47.7 per cent more than would have been paid under the rate schedule applicable to the general service customers of Riverton. From January 1, 1951, when an increase of 30 per cent in general service rates became effective, to June 30, 1955, the Navy paid approximately 13.1 per cent more for the water service provided to the Naval Supply Depot. In 1950 the Navy sought to have the rates applicable to general service customers made applicable to the service provided to the Naval Supply Depot, but the utility refused. Under the order of the commission in the present proceeding the rates for service to the Naval Supply Depot will be the same as those of the other customers of Riverton, which proposes to systematize the rates to its metered customers. The higher rates for water furnished to the Naval Supply Depot from 1945 to June 30, 1955, resulted in a payment by the Navy of approximately $17,904 more than would have been paid if the general service rates were applied; and the Navy in this proceeding sought to have that amount refunded. The commission refused to order reparations because the original agreement between Riverton and the Navy provided for the rates charged and this rate schedule was filed with the commission and became the official tariff applicable to the Navy. There is in the record evidence of correspondence in 1950 between Riverton and the Naval Supply Depot which discloses that the higher rate was placed in the original contract because, inter alia, it was comparable to the rate paid by the Navy to the Mechanicsburg

Water Company which also supplies water to the Naval Supply Depot. This evidence was admitted apparently without objection.

The grant of refunds is governed by section 313(a) of the Public Utility Law, 66 PS §1153, and such refunds are limited to those shown to be due within the two years preceding the complaint. Within the limits of the statute, the period for which a refund, if any, is granted is a matter largely within the discretion of the commission; section 313(a) relating to refunds is not mandatory. *Magee Carpet Company v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 438, 449, 102 A. 2d 229; *Lancaster Ice Manufacturing Company v. Pennsylvania Public Utility Commission,* 185 Pa. Superior Ct. 615, 625, 138 A. 2d 262. The commission in this instance considered the claim of the United States and found no basis in the record for determining that the rates charged in the past were unreasonable or discriminatory; if true there could be no refunds. Section 304 of the Public Utility Law, 66 PS §1144, prohibits unreasonable differences in rates "as between localities or as between classes of service." Whether a difference in rates between classes of customers or between localities amounts to unjust discrimination is an administrative question for the commission. *Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission,* 176 Pa. Superior Ct. 550, 562, 109 A. 2d 719. The difference between the rate established in the agreement by the Navy and Riverton, as approved by the commission, and the general service rate does not alone establish that Navy's rate was unreasonably discriminatory. See *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 394, 126 A. 777. At the time the agreement was made, Navy and Riverton apparently were satisfied that there was sufficient basis for the

distinction, considering the facts that a substantially extended large water main had to be constructed and maintained, and that the Naval Supply Depot was also served by another water company.

The assertion of the United States that in 1950 it sought to substitute the lower general service rates is without merit, since under the contract it could only request a change commensurate with new rates of the utility, not with the prior rates. No written request was presented after new rates were made effective by Riverton. Moreover, this facet of the relationship between the Navy and Riverton was not raised in the complaint of the United States and is not a proper issue in this proceeding.

*The United States Army Depot at New Cumberland.* The United States Army Depot at New Cumberland receives water service from Riverton at Riverton's pumping station through a 10-inch main, extending 5,-300 feet, which is owned by the Army. In 1954 Riverton and the Army modified their 1942 contract,[4] and agreed that Riverton would install a pressure reducing valve and move the water meter on the 10-inch main from the pumping station to the entrance of the Army Depot. Riverton assumed responsibility for maintenance and for water lost by leakage on the 10-inch main. For a rental fee of $25 per year paid to the Army, it received the right to attach additional customers (other than industrial) on the line in so far as surplus capacity therefor would be available. At the time of this proceeding, thirty-two customers were

---

[4] In 1942, the Army advanced $55,011 to Riverton for reinforcement of Riverton's filtration and pumping plants in order to meet the Army's increased wartime water demands. Repayment of this advance was on the basis of 33 1/3 per cent of gross monthly billings to the Army. As of June 30, 1955, a balance of $3,639 remained unrefunded.

served from the Army line. The water received by the Army Depot at its end of the 5,300-foot main is utilized in the Army's own water system which includes an elevated storage of 1,000,000 gallons. Riverton's transmission and distribution systems, other than a water meter and pressure reducing valves, are not utilized by the Army. The rate schedule now applicable to the Army is the general service rate schedule applicable to all other customers of Riverton except the Naval Supply Depot. The schedule is divided into eight consumption blocks with the usual reduction in rate per 100 cubic feet of water as the consumption of water increases. The charge per 100 cubic feet of water decreases from 44 cents per unit in the first block to 10 cents in the eighth block. Approximately 92 per cent of the water purchased by the Army is at the rate in the eighth block. In addition to the general service rate the Army paid for fire protection service under a special supplement to the general service tariff. It is the contention of the United States that it should not be obliged to pay for fire protection service as it maintains its own fire protection system which uses water paid for by the Army and received from Riverton through the 10-inch main. It is further argued that the commission erred in applying the general service rate schedule to water service provided to the Army Depot because it costs less for Riverton to serve the Army than to serve the other customers on the Riverton system.

*Fire Protection Service.* Supplement No. 4 to tariff No. 8 provided for an additional charge for fire protection service when a customer maintains a private system of fire hydrants, automatic sprinkler systems, or other fire protection appliances connected directly or indirectly to a metered service through which water is also supplied for ordinary purposes. If a storage

tank is maintained the charge is at half rate. During the time a fire is in progress, however, no charge is made for the water passing through the customer's meter. The contention of the United States that it should not pay the charge for fire protection service is based on the fact that it maintains a fire protection system and its own storage tank which is filled with water passing through the meter and paid for at the general service rate. The United States obviously has misinterpreted the provisions of the supplement relating to the charge for fire protection. It is to such service that the fire protection charge applies. Apparently the United States believes that the charge is ordinarily made to other customers only if the water used in the private fire protection system is not previously paid for through a meter. The clear language of the supplement indicates that the charge for this fire protection is made in addition to the charge for metered water even though the water has been paid for and stored by the customer in its own tank for use during a fire.[5]

---

[5] The supplement provides: "When a customer has private fire hydrants or automatic sprinkler systems, or other fire protection appliances, connected directly or indirectly to a metered service through which water is also supplied for domestic, manufacturing. commercial, or other purposes, the above charges will be made in addition to the rates described in the rate schedule for metered water service; provided, however, that if such customer shall, as a part of his private fire protection system, erect, maintain, and keep filled with water one or more tanks of a total capacity of not less than 300,000 gallons, only fifty per cent of the above charges will be made in addition to the rates prescribed in the rate schedule for metered water service; and provided further, that no charge will be made for water passing through a meter during the time a fire is in progress."

The private fire protection rates are as follows:

"For private fire protection, the rates would be $21.50 per annum for a fire hydrant, $1.45 per month per inch of diameter of sprinkler connection, and $0.0072 per month per sprinkler head."

The reason for the charge in addition to that made under the general service rate schedule is that Riverton must provide and maintain certain plant in readiness on a standby basis in order to meet the additional demand for service during a conflagration.

*Rate Schedule Applicable to the Army.* The United States contends that the Army should receive water under a separate classification with lower rates than those paid by other customers. The rate schedule applicable to other customers of Riverton is made applicable to the Army Depot.[6] As we have indicated, the Army Depot purchases approximately 92 per cent of its water in the eighth or lowest rate block. Whether a separate rate schedule should have been created for the Army must depend upon whether there is some substantial difference in the service, or cost thereof, provided to the Army Depot.

The rate schedule submitted by Riverton provided for a rate of 8 cents per 100 cubic feet of water in the eighth rate block. In support of the submitted schedule Riverton offered Exhibit 35, a "Comparison of Cost of Water Sold to U. S. Army Depot at New Cumberland, Pa., and Cost of Production of Water." The commission modified the rate schedule submitted by Riverton by increasing the eighth rate block from 8 to 10 cents per 100 cubic feet of water and by reducing the unit rates in the other rate blocks. The commission analyzed the proposed rate schedule and found that it was based on an erroneous cost of service study by Riverton, primarily as it related to the eighth rate block; Riverton had based its cost of service to the Army Depot upon the quantity of water metered from the 10-inch Army main without making allowance for

---

[6] Although the Naval Supply Depot rates are contained in a separate tariff, they have been equalized by this proceeding.

the system-wide average loss of water of 34.2 per cent. The evidence of Riverton showed that under the rate schedule claimed by Riverton 8.65 cents in revenue would be received from the Army for every 100 cubic feet of water sold to it. Riverton computed that the cost of this service based on water pumped at its pumping station would be 5.09 cents, leaving 3.56 cents per 100 cubic feet of water available for return and income taxes. The commission recomputed the cost of service for the Army on the basis that Riverton had to pump 152 cubic feet of water[7] in order that a customer may receive 100 cubic feet of water. The commission then divided the 8.65 cent revenue per 100 cubic feet by 1.52 to derive a revenue of 5.69 cents received by Riverton per 100 cubic feet of water pumped by Riverton for the Army. From this unit revenue the commission subtracted the 5.09 cent cost of service submitted by Riverton to derive .60 cents available for return and income taxes per 100 cubic feet of water pumped for the Army Depot. After deducting the portion attributable to income taxes the commission found that the proposed 8 cent rate block would provide a return of only .9618 per cent as compared with the over-all fair return of 5.8 per cent found by the commission. In further analyzing the cost of service to the Army Depot, the commission eliminated certain plant and equipment not attributable to providing service to the Army, and recognized that Riverton's transmission and distribution systems (other than a meter and pressure reducing valves) are not utilized by the Army. It then found that the annual cost per 100 cubic feet of water (228,492 (100 cubic feet)) pumped to supply the Army with 150,324 (100

---

[7] The commission applied the 34.2 per cent line loss in determining that Riverton had to pump 1.52 times more water than customers received. .

cubic feet) would actually be 5.41 cents; after subtracting this cost from the revenue of 5.69 cents the commission found that .28 cents per 100 cubic feet of water pumped would be available for income taxes and return. The proportion attributable to income taxes was deducted, leaving an amount available for return which was .76 per cent of fair value chargeable to the Army service as compared with the over-all fair return of 5.8 per cent found by the commission. The evidence of Riverton, without consideration of the 34.2 per cent line loss of water, indicated that the proposed rate schedule, including the 8 cent eighth rate block, would have provided a return from the service to the Army Depot of 5.71 per cent. The commission concluded that the 8 cent eighth rate block was too low with respect to all customers as the cost of water pumped at its pumping station was 5.41 cents per 100 cubic feet, resulting in a cost of 8.22 cents per 100 cubic feet of water sold (5.41 x 1.52).

The United States contends that it was error for the commission to consider the high system-wide line loss of 34.2 per cent in arriving at the cost of service to the Army Depot. The increase in the eighth rate block from 8 cents, as proposed by Riverton, to 10 cents, as found by the commission, was primarily the result of the application of this factor to the cost of service. The action of the commission increases the annual amount to be paid by the Army by approximately $2,700. A ratio of water loss of 34.2 per cent, even system-wide, appears to be high, and the commission so noted in its order. The reason for such a high ratio is not apparent in this record. Although the commission suggested that a water waste survey be made by Riverton, it did not order one because the cost of such survey and repairs was disproportionate to the savings to be effected thereby. Whatever the reason may be

for such a high system-wide loss ratio, it is clear that there is no commensurate amount of loss attributable to the special line from Riverton's pumping station to the Army Depot. The United States demonstrated the unreasonableness of the commission's conclusion by pointing out that, in order for the Army to receive 112,371,000 gallons of water annually, Riverton has to pump 170,804,000 gallons into its line according to the commission formula, which means that 58,433,000 gallons are lost along the 5,300 feet of main between the Riverton pumping station and the Army Depot.[8] This amounts to an annual loss of 1,102,500 gallons for every 100 feet of main. The line loss obviously does not approximate this amount. If it did the area between the Riverton pumping station and the Army Depot could be a marshland as a result. The record indicates that line losses are greater in the distribution system than in the transmission system. Since the commission found that neither Riverton's transmission system nor its distribution system is utilized by the Army Depot, there is certainly no reason for applying the system-wide loss ratio to the Army service. The separate 5,300-foot main of the Army, under the circumstances, provides the basis for treating the Army Depot differently in this respect, notwithstanding it may be that the Army Depot uses 12.6 per cent of the water delivered to all customers and 2.82 per cent of Riverton's plant. See *Pittsburgh v. Pennsylvania Public Utility Commission,* 185 Pa. Superior Ct. 460, 137 A. 2d 914. A rate schedule "should allocate equitably basic fixed charges to the cost of delivery . . . at a given point." *Pittsburgh v. Pennsylvania Public*

---

[8] In comparison Riverton's distribution system has a total of 634,175 lineal feet of mains of various sizes, 414 fire hydrants, and a storage capacity of 3,535,500 gallons.

*Utility Commission,* 178 Pa. Superior Ct. 46, 67, 112 A. 2d 826, 835. The line loss of 34.2 per cent in the transmission and distribution system of Riverton used by customers other than the Army is not a basic fixed charge attributable to the service provided the Army. It would appear, therefore, that a separate rate schedule should be created for the Army Depot and the other customers on the Army line which recognizes this distinguishing feature of the cost of service.

The United States also requested the commission to award reparations based upon the difference between the charges paid by the Army under the rate schedule prior to this proceeding and the charges which it believed would have been just, reasonable, and lawful, together with interest. The rates in effect prior to this proceeding were based on a schedule applicable to all customers (except the Navy) which became effective on January 15, 1951, pursuant to an order of the commission at Complaint Docket 14983. The United States apparently did not make a complaint against the schedule at the time, it did not intervene in that proceeding, and it did not take an appeal from the order. Consequently, it was not improper for the commission to refuse the request for reparations. See *West Penn Power Company v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 123, 131, 100 A. 2d 110.

The order of the commission of August 7, 1956, is set aside to the extent indicated; and the record is remanded to the commission for the determination of rate schedules applicable to United States Army Depot and to other customers on the Army main, which will be reasonable and non-discriminatory. The commission shall make refunds to such customers as may be ascertained to be payable since the date of existing schedules (August 15, 1956) applicable to such customers. If the result of the adjustment of such present rate

schedules approximates the excess return by reason of the allowance above the cost of capital, the other rate schedules may not require revision to correct the error in the excessive rate of return. In other respects the order of the commission is affirmed.

Each party to pay its own costs.